FILED
2026 Jul-27 AM 09:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

CITY OF LIPSCOMB FIRE DEPARTMENT, LIPSCOMB, ALABAMA, individually and on behalf of a class of all others similarly situated,

Plaintiff,

v.

3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY), EIDP, INC., DUPONT DE NEMOURS, INC., THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, CORTEVA, INC., CB GARMENT, INC., ELEVATE TEXTILES, INC., FIRE-DEX, LLC, GLOBE MANUFACTURING COMPANY, LLC, W.L. GORE & ASSOCIATES, INC., HONEYWELL SAFETY PRODUCTS USA, INC., LION GROUP, INC., MAJESTIC FIRE APPAREL, INC., MILLIKEN & COMPANY, MORNING PRIDE MANUFACTURING L.L.C., MSA SAFETY COMPANY, INC., SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC., STEDFAST USA, INC., and VIKING LIFE SAVING EQUIPMENT (AMERICA), INC..

Defendants.

**CLASS-ACTION COMPLAINT**

**(Demand for Jury Trial)**

## CLASS-ACTION COMPLAINT

Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Lipscomb Fire Department, Lipscomb, Alabama ("Plaintiff" or "Lipscomb"), individually and on behalf of all others similarly situated, sues 3M Company (f/k/a Minnesota Mining and Manufacturing Company); EIDP, Inc.

(f/k/a E.I. du Pont de Nemours and Company); DuPont de Nemours, Inc.; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; CB Garment, Inc. (d/b/as CrewBoss); Elevate Textiles, Inc.; Fire-Dex, LLC; Globe Manufacturing Company, LLC; W.L. Gore & Associates, Inc.; Honeywell Safety Products USA, Inc.; Lion Group, Inc.; Majestic Fire Apparel, Inc.; Milliken & Company; Morning Pride Manufacturing L.L.C.; MSA Safety Company, Inc.; Safety Components Fabric Technologies, Inc.; Stedfast USA, Inc.; and Viking Life Saving Equipment (America), Inc. (collectively, "Defendants"). Lipscomb alleges the following based upon the investigation of Plaintiff's counsel, information and belief, personal knowledge, and a review of publicly available information.

## INTRODUCTION

1. The City of Lipscomb is a Class 8 Municipality within the State of Alabama. As such, its functions include operating the Lipscomb Fire Department, which safeguards life, property, and natural resources through fire prevention, suppression, and response. The City of Lipscomb Fire Department is responsible for funding the cost of the Fire Department's equipment, tools, and gear.

2. Lipscomb and a proposed Class of fire departments ("Class Members") purchased and/or used Defendants' specialized occupational personal protective equipment ("PPE") including; self-contained breathing apparatuses, hoods, helmets, coats, pants, gloves, boots, reflective tape, and other multilayered PPE ("Turnout Gear"), which are laden with highly toxic, carcinogenic, synthetic perfluorinated, and polyfluorinated alkyl substances ("PFAS"). Lipscomb and the other Class Members are fiscally responsible for the protective gear of the respective fire departments' firefighters.

3. PFAS are highly toxic, synthetic chemical compounds made of nearly indestructible chains of carbon and fluorine atoms. PFAS accumulate and concentrate in the human body with exposure.[1] Once released into the environment and the human body, PFAS persist for a long, if not indefinite, period, earning them the nickname "forever chemicals." They are difficult to remediate, requiring specialized and costly protocols.

4. The PFAS in the contaminated Turnout Gear ("PFAS Turnout Gear") leach, shed, crumble, abrade, off-gas (a process in which a chemical is emitted in the form of a gas), and otherwise migrate out of the PPE, causing unreasonably dangerous exposure and contamination of firefighters, fire stations, fire trucks, occupational equipment, personal property, firehouse furnishings, lockers and storage areas, laundering equipment and facilities, bunk rooms, other surrounding property, and other exposed employees, volunteers and persons.[2]

5. When exposed to heat, ultraviolet light, water, and routine wear and handling, PFAS off-gas, break down, and degrade into highly mobile and toxic particles and dust,[3] further accelerating contamination of their surrounding environment and human PFAS exposure.

6. Plaintiff and Class Members purchased the PFAS Turnout Gear to protect the health and safety of their firefighters from the extreme conditions of firefighting activities, such as the

---

[1] Paul E. Rosenfeld et al., *Perfluoroalkyl substances exposure in firefighters: Sources and implications*, 220 ENVIRON. RESEARCH (2023), *available at* https://doi.org/10.1016/j.envres.2022.115164.

[2] Anna S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust*, J. EXPO. SCI. & ENVIRON. EPIDEMIOLOGY (2021), *available at* https://www.nature.com/articles/s41370-021-00288-7.

[3] *Id.*

"thermal, physical, environmental, and bloodborne pathogen hazards encountered during structural firefighting operations."[4]

7. Instead, Defendants' PFAS Turnout Gear releases toxic PFAS that contaminate Class Members' firehouses and trucks and which are absorbed, inhaled, and ingested by Plaintiff's and other Class Members' firefighters and bioaccumulate in their bodies, resulting in unreasonable toxic exposure known to cause cancer, disease, and other harmful health conditions.

8. Over the past thirty to forty years, the leading cause of line-of-duty death in the fire services has changed from cardiac events to cancer.[5] That change directly corresponds to the timing of Defendants' addition of PFAS to PPE and their commercialization of PFAS Turnout Gear.

9. Occupational cancer is the leading cause of line-of-duty deaths in the fire service. Seventy percent of firefighters are predicted to eventually die from cancer, which is significantly higher than the general population.[6]

10. Defendants manufactured and marketed the PFAS Turnout Gear and put it into the stream of commerce to be purchased and/or acquired by the Class Members. PFAS are toxic chemicals, immunotoxic agents, and carcinogenic compounds that have posed and continue to

---

[4] Andrew Maizel et al., *Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles*, NIST Technical Note (TN) (2023), https://www.nist.gov/publications/and-polyfluoroalkyl-substances-new-firefighter-turnout-gear-textiles.

[5] *Id.*

[6] Graham F. Peaslee et al., *Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles*, Environmental Science & Technology Letters 7, 8, 594-599 (June 23, 2020), https://pubs.acs.org/doi/10.1021/acs.estlett.0c00410.

pose a serious risk of injury to the health and safety of the firefighters and others exposed to the chemicals through PFAS Turnout Gear use, cleaning, and storage.[7]

11. Lipscomb Fire Department and Class Members purchased, acquired or otherwise provided the PFAS Turnout Gear to protect firefighters' health and safety from the extreme conditions of firefighting activities, such as the "thermal, physical, environmental, and bloodborne pathogen hazards encountered during structural firefighting operations."[8]

12. Instead, Defendants' PFAS Turnout Gear have released, and continue to release, toxic PFAS that contaminate Class Members' firehouses and trucks and are absorbed, inhaled, and ingested by Lipscomb's Fire Department and other Class Members' firefighters and accumulate in their bodies, resulting in unreasonable toxic exposure known to cause cancer, disease, and other harmful health conditions.

13. Defendants, who knew for decades that PFAS posed major health risks, through a common enterprise ("PFAS Cover-Up Enterprise"), sold, marketed, and otherwise supplied PFAS Turnout Gear to the Class Members without disclosing the toxicity of the PFAS Turnout Gear. Rather, for decades, Defendants suppressed negative scientific research regarding PFAS. In addition, Defendants made misleading statements to the public about the safety of the PFAS in

---

[7] *See, e.g.*, Nat'l Toxicology Program, U.S. Dept. of Health & Human Servs., NTP MONOGRAPH ON IMMUNOTOXICITY ASSOCIATED WITH EXPOSURE TO PERFLUOROOCTANOIC ACID OR PERFLUOROOCTANE SULFONATE (Sept. 2016) ("NTP MONOGRAPH IMMUNOTOXICITY"), *available at* https://ntp.niehs.nih.gov/sites/default/files/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf; Nur-Us-Shafa Mazumder et al., "Firefighters' Exposure to Per-and Polyfluoroalkyl Substances (PFAS) as an Occupational Hazard: A Review," FRONTIERS IN MATERIALS (Mar. 2023).

[8] Andrew Maizel et al., *Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles*, NIST Technical Note (TN) (2023), *available at* https://www.nist.gov/publications/and-polyfluoroalkyl-substances-new-firefighter-turnout-gear-textiles ("PFAS in New Firefighter Turnout Gear Textiles").

Turnout Gear. Accordingly, for decades, Defendants, through a common enterprise, promoted, sold, and otherwise distributed PFAS Turnout Gear that created an unreasonable risk of harm.

14. Over the past forty years, the leading cause of line-of-duty death in the fire services has changed from cardiac events to occupational cancer.[9] That change directly corresponds to when Defendants added PFAS to PPE and commercialized PFAS Turnout Gear. Seventy percent of firefighters are predicted to eventually die from cancer, which is significantly higher than the general population.[10] The change over the decades closely corresponds to when Defendants added PFAS to firefighters' PPE and commercialized PFAS Turnout Gear.

15. Defendants, fraudulently concealing negative scientific research, failed to disclose to fire departments and public entities that use Turnout Gear that the PFAS in Turnout Gear is dangerous to health, property, and the environment. Instead, Defendants collaborated to conceal the truth, and such concealment was a common purpose of the PFAS Cover-Up Enterprise.

16. Facing mounting peer-reviewed studies, increased public awareness, demands for transparency and disclosure, and growing state-law prohibitions on PFAS in Turnout Gear, Defendants are finally beginning to publicly acknowledge that PFAS, especially the concentrations included in Turnout Gear, are unreasonably dangerous. Thus, Defendants have recently been shifting their focus to PFAS-free Turnout Gear.

17. The nature of the Turnout Gear industry, including its standards and certification processes, requires Defendants to share information, agree on materials, and cooperate in the design, manufacture, promotion, sale, and commercialization of finished Turnout Gear.

---

[9] *Id.*

[10] Graham F. Peaslee, et al., *Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles*, Environmental Science & Technology Letters 7, 8, 594-599 (June 23, 2020), https://pubs.acs.org/doi/10.1021/acs.estlett.0c00410.

18. As explained by textile manufacturer Milliken: "Milliken saw the writing on the wall and got to work."[11] The "writing on the wall" Milliken was referring to was "[t]he growing chorus of concern over the last several years from firefighters, lawmakers, insurers, and environmentalists [, which] has all but guaranteed that use of PFAS was going away sooner rather than later."[12]

19. 3M Company ("3M") announced that it would halt production of PFAS chemicals and work to phase out PFAS in all its products by the end of 2025.[13] Upon information and belief, 3M would not have made this announcement unless it knew there were safer alternatives to PFAS in Turnout Gear.

20. At least as of 2025, there are available in the marketplace PFAS-free Turnout Gear that comply with the water-repellent and heat-resistive characteristics and industry standards for firefighter PPE embodied in applicable National Fire Protection Association ("NFPA") standards.

21. Such PFAS-free Turnout Gear would have been available much earlier if Defendants had focused earlier on making it available to ensure the safety of firefighters' Turnout Gear rather than attempting to suppress information regarding PFAS.

22. Toxic PFAS contamination is ongoing and escalating. Until the PFAS Turnout Gear is destroyed and disposed of, and the contaminated property is effectively remediated, the unreasonably dangerous toxic exposure and contamination will continue. Potentially even

---

[11] Milliken, *Why is PFAS used in firefighters protective gear*, https://www.milliken.com/en-us/businesses/textile/blogs/why-is-pfas-used-in-firefighters-protective-gear.

[12] Jesse Roman, *Consequential changes to firefighter personal protective equipment (PPE)*, NATIONAL FIRE PROTECTION ASSOC. J. (Apr. 16, 2025), *available at* https://www.nfpa.org/news-blogs-and-articles/nfpa-journal/2025/04/14/deadline-pressure.

[13] 3M, *3M's PFAS Stewardship*, https://www.3m.com/3M/en_US/pfas-stewardship/uses-applications/?utm_medium=redirect&utm_source=vanity-url&utm_campaign=pfas.3m.com/pfas_uses.

escalating with use and handling, causing ongoing injuries and damage to firefighters, fire stations, property, and the surrounding environment.

23. Fire departments exist for the safety, health, and general welfare of the public. Plaintiff's and Class Members' firefighters perform their fire-protection and emergency services for the safety, health, and welfare of the public.

24. Lipscomb is asserting public rights and public interests in pursuing statutory and common law remedies against Defendants to recover the costs of remediation, repair, and replacement of property contaminated by PFAS, including replacement of PFAS Turnout Gear, and elimination of the ongoing toxic exposure Plaintiff's and Class Members' firefighters and other persons exposed to unreasonably dangerous PFAS, that are known to cause cancer and other serious harms to human health.

## PARTIES

### I. Plaintiff

25. Plaintiff is an incorporated Class 8 municipality located in Jefferson County within the state of Alabama. Plaintiff operates a fire department and employs approximately 16 firefighters on a voluntary basis. The inclusion of smaller municipalities, fire districts, and rural jurisdictions in litigation involving PFAS-contaminated firefighter turnout gear is essential to ensuring that justice is available to all communities; not only those with the financial resources to pursue complex litigation independently. While larger metropolitan fire departments often have dedicated budgets, risk management divisions, and access to specialized legal counsel, smaller jurisdictions frequently operate with limited tax bases and constrained public funding.

26. Despite these financial disparities, the dangers posed by PFAS-containing turnout gear are identical. Firefighters in rural communities face the same exposure to toxic chemicals

during every emergency response, yet their departments are often the least equipped to absorb the substantial costs associated with replacing contaminated gear, remediating stations, and implementing ongoing decontamination measures.

27. The need for relief is particularly acute in rural areas, where fire departments often protect expansive wooded, agricultural, and forested regions that experience an increased risk of wildland and structural fires. These departments routinely respond to prolonged incidents that require firefighters to wear turnout gear for extended periods, potentially increasing repeated exposure to PFAS chemicals.

28. Moreover, many rural departments rely heavily on volunteer firefighters who generously donate their time to protect their communities. Nationally, approximately two-thirds of the nation's firefighters serve on a volunteer basis, and the overwhelming majority of those volunteers serve in communities with populations under 25,000. These firefighters deserve the same level of protection and access to safe equipment as their counterparts in larger urban departments, regardless of the financial limitations of the communities they serve.

29. Excluding smaller jurisdictions from PFAS litigation would disproportionately burden the very communities least able to shoulder the costs of replacing contaminated equipment and addressing environmental contamination. The expense of a single set of modern turnout gear can exceed $4,000, and departments must outfit every firefighter while also accounting for replacement cycles, contaminated storage facilities, cleaning equipment, and compliance with evolving safety standards.

30. Majority of the Class 8 Municipalies operate on modest annual budgets supported by local taxes, grants, and fundraising efforts, these costs are simply unattainable without legal

recovery. As a result, many departments are forced to continue using potentially contaminated gear long after concerns regarding PFAS exposure have become widely recognized.

31. A comprehensive class action provides an efficient and equitable mechanism to ensure that all affected public entities; regardless of size or financial resources, have an opportunity to seek compensation for the widespread harm caused by PFAS containing turnout gear.

32. Including smaller jurisdictions promotes uniformity in adjudication, avoids inconsistent results, and recognizes that public safety should not depend upon the size of a municipality's budget. Every firefighter, whether serving in a major metropolitan department or as a volunteer in a rural community, answers the same call to protect life and property. Likewise, every community deserves the opportunity to recover the resources necessary to provide its firefighters with safe equipment and to remediate the ongoing impacts of PFAS contamination.

33. Over the last five years or more, Plaintiff has purchased or acquired from the stream of commerce its Turnout Gear from Defendants CB Garment, Inc. (d/b/a CrewBoss) ("CB Garment"), Fire-Dex LLC ("Fire-Dex"), Majestic Fire Apparel, Inc. ("Majestic"), Morning Pride Manufacturing L.L.C. ("Morning Pride"), MSA Safety Company, Inc. ("MSA Safety"), Globe Manufacturing Company, LLC ("Globe"), Lion Group, Inc. ("Lion") and Viking Life Saving Equipment (America), Inc. ("Viking"). The outer shell, moisture barrier, thermal liner, and other components of the Turnout Gear Plaintiff purchased or acquired contained PFAS-contaminated textiles or other components designed, manufactured, marketed, distributed, applied, sold and/or placed in the stream of commerce by Defendants.

## II. Defendants

34. For decades, PFAS Turnout Gear has been designed, tested, manufactured, marketed, sold, and applied through the collective, organized, and highly interdependent contributions of Defendants. Each Defendant contributes a necessary and essential component, material, chemical, or related service without which the PFAS Turnout Gear could not be produced, sold, acquired or introduced into the stream of commerce. Each Defendant knows and intends that its products and services will be combined to create the final PFAS Turnout Gear purchased or acquired by Plaintiff and the Class Members for use by their firefighters in Alabama.

**1. PFAS Chemical Finish Defendants**

35. Defendants EIDP, Inc., DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc. (collectively, "DuPont") and 3M (together with DuPont, the "PFAS Chemical Finish Defendants") design, manufacture, market, and sell PFAS performance chemicals for high-hazard clothing, including durable water-and-oil repellants, fluorochemical finishes, coatings, surfactants, adhesives, fluoropolymer dispersions, membrane coatings, adhesion promoters, finishing sprays, repellency boosters, and durable water repellent coatings; as well as other PFAS performance chemicals applied to the fabrics, textiles, adhesives, reflective tape, and assembled Turnout Gear (e.g., PFAS tapes, adhesives, and finishing sprays) (collectively, "PFAS Chemical Finishes").

36. PFAS Chemical Finish Defendants make the PFAS molecules, such as fluorotelomer alcohols ("FTOHs"), fluorinated acrylates, perfluorinated surfactants, and side-chain fluorinated polymers, which are the building blocks of the PFAS Chemical Finishes.

37. All PFAS Turnout Gear purchased or acquired by Plaintiff and the Class contains PFAS Chemical Finishes designed, manufactured, marketed, sold and/or placed in the stream of commerce by at least one of, and often both, DuPont and 3M.

38. PFAS Finish Defendants invented, developed, and commercialized PFAS Chemical Finishes into an essential component in the billion-dollar Turnout Gear industry.

**i. Defendant 3M**

39. Defendant 3M, formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation that does business throughout the United States, including in Alabama, and has its principal place of business in St. Paul, Minnesota.

40. 3M's PFAS Chemical Finishes were among the earliest used in Turnout Gear and included perfluorooctane sulfonate ("PFOS"), PFOS-based surfactants and repellants, and Scotchgard fluorochemical repellents (legacy versions). 3M was the leading manufacturer and supplier of PFAS Chemical Finishes until 2002 and is still the world's largest PFAS tape and adhesive manufacturer.

41. In addition to PFAS Chemical Finishes, 3M invented, designed, manufactures, markets, and sells 3M Scotchlite Reflective Tape, which contains PFAS and is used on the PFAS Turnout Gear purchased, acquired and/or used by Plaintiff and members of the proposed Class.

**ii. Defendant DuPont**

42. Defendant EIDP, Inc., formerly known as E.I. du Pont de Nemours and Company, is a Delaware corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Wilmington, Delaware.

43. Defendant DuPont de Nemours, Inc. is a Delaware corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Wilmington, Delaware.

44. Defendant The Chemours Company ("Chemours") is a Delaware corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Wilmington, Delaware. In 2015, EIDP, Inc. spun off its performance chemical business as a new, publicly traded company, Chemours. In connection with the transfer, Chemours assumed certain EIDP, Inc. assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of the PFAS Chemicals that are the subject of this Action.

45. Defendant The Chemours Company FC, LLC ("Chemours FC") is a Delaware corporation that does business throughout the United States, including in Alabama. Chemours FC has its principal place of business in Wilmington, Delaware. Chemours FC is a subsidiary of Chemours and manufactures the PFAS Chemicals that are the subject of this action.

46. Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Wilmington, Delaware. In 2019, DuPont de Nemours, Inc., spun off its agricultural business as a new, publicly traded company, Corteva, which currently holds EIDP, Inc. as a subsidiary. In connection with these transfers, Corteva assumed certain EIDP, Inc. assets and liabilities, including business lines and liabilities relating to the design, manufacture, marketing, distribution, and sale of the PFAS Chemicals that are the subject of this action.

47. In 2002, PFOS were phased out and DuPont replaced 3M as the dominant supplier of fluorotelomer alcohols, C6 fluorotelomer acrylates, Zonyl™ fluorochemical repellents, and Capstone™ repellents—all of which are PFAS.

**2. PFAS Fabric Producer and PFAS Turnout Gear Assembler Defendants**

48. The PFAS Fabric Producer Defendants design, market, and sell PFAS Fabrics to entities that design, assemble, market, sell and/or introduce into the stream of commerce the finished PFAS Turnout Gear.

49. PFAS Turnout Gear assemblers put together component materials to create the final, finished PFAS Turnout Gear they then sell and introduce in the stream of commerce under their respective brand names to Plaintiff and Class Members. They source outer shells, moisture barriers, and thermal liners from other producers in the supply chain; cut, sew, laminate, and assemble the components; apply additional treatments or finishes, including PFAS Chemical Finishes; brand the Turnout Gear under their own names; and certify the final Turnout Gear product to NFPA standards.

50. Although the outer shell, moisture barrier, and thermal liners already contain PFAS, the PFAS Turnout Gear assemblers apply additional PFAS Chemical Finishes after cutting and sewing. For example, PFAS Turnout Gear assemblers apply PFAS Chemical Finishes to the outer shell and reinforcements to enhance repellency and increase stain, oil, and chemical resistance.

51. PFAS Turnout Gear assemblers add extra concentrated applications of PFAS Chemical Finishes; apply adhesives and seam tapes to seal moisture-barrier seams and reinforce stress points; and bond reflective trim, bonding patches, labels, and structural reinforcements, including at the knees, elbows, cuffs, and pockets.

52. PFAS adhesives contain fluorinated acrylic polymers, fluorotelomer-based surfactants, PFAS-modified urethanes and polytetrafluoroethylene (“PTFE”)-filled adhesive film.

53. PFAS Turnout Gear assemblers apply PFAS-based repellency boosters and PFAS-based anti-static or anti-soiling sprays to the final, finished Turnout Gear. PFAS Turnout Gear assemblers also use PFAS-containing lubricants on sewing equipment.

54. PFAS glues, bonding agents, and lamination adhesives used by PFAS Turnout Gear assemblers during assembly are not reported in fabric Material Safety Data Sheets but nevertheless substantially increase the total PFAS load in the finished Turnout Gear.

55. The PFAS Turnout Gear purchased and/or acquired by Lipscomb and Class Members contains PFAS Fabrics designed, manufactured, marketed, sold and/or placed in the stream of commerce by at least one PFAS Fabric Producer Defendant and/or PFAS Turnout Gear Assembler Defendant.

56. Defendant CB Garment, Inc. (d/b/a CrewBoss) ("CB Garment") is Delaware corporation that does business throughout the United States including in Alabama, and has its principal place of business in Eugene, Oregon. CB Garment is a subsidiary of WS Acquisition, LLC, which operates under the broader umbrella of Western Protective Solutions.

57. Defendant Elevate Textiles, Inc. ("Elevate Textiles") is a Delaware corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Charlotte, North Carolina. Elevate Textiles is the corporate parent of Defendant Safety Components Fabric Technologies, Inc.

58. Defendant W.L. Gore & Associates, Inc. ("Gore") is a Delaware corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Newark, Delaware.

59. Defendant Majestic Fire Apparel, Inc. ("Majestic") is a Pennsylvania-based corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Lehighton, Pennsylvania.

60. Defendant Milliken & Company ("Milliken") is a Delaware corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Spartanburg, South Carolina.

61. Defendant MSA Safety Company, Inc. ("MSA Safety") is a Pennsylvania corporation that does business throughout the United States, including Alabama, and has its principal place of business in Cranberry Township, Pennsylvania.

62. Defendant Safety Components Fabric Technologies, Inc. ("Safety Components") is a Delaware corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Greenville, South Carolina. Safety Components is a subsidiary of Defendant Elevate Textiles.

63. Defendant Stedfast USA, Inc. ("Stedfast") is a Delaware corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Piney Flats, Tennessee.

64. Defendant Fire-Dex is an Ohio limited liability company that does business throughout the United States, including in Alabama, and has its principal place of business in Medina, Ohio.

65. Defendant Globe is a New Hampshire corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Pittsfield, New Hampshire.

66. Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Charlotte, North Carolina.

67. Defendant Lion is an Ohio corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Dayton, Ohio.

68. Defendant Morning Pride is a Delaware corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Fort Mill, South Carolina.

69. Defendant Viking Life Saving Equipment (America), Inc. ("Viking") is a Delaware corporation that does business throughout the United States, including in Alabama, and has its principal place of business in Medley, Florida.

70. Lipscomb and Class Members have paid for, acquired and/or used PFAS Turnout Gear designed, assembled, manufactured, produced, marketed, sold and/or placed in the stream of commerce by CB Garment, Fire-Dex, Globe, Lion, Majestic, Morning Pride, MSA Safety, Viking and other PFAS Fabric Producers and PFAS Turnout Gear Assembler Defendants.

71. Plaintiff alleges that each Defendant is responsible in some manner for the acts alleged herein, and that the Defendants proximately caused injuries to Lipscomb and Class Members, as alleged herein.

72. Plaintiff alleges that each Defendant derived substantial revenue from the equipment, materials, or chemicals that are the subject of this action. Defendants designed, developed, tested, manufactured, packaged, promoted, marketed, advertised, distributed, and sold the equipment, materials, and chemicals throughout the United States, including in Alabama, and caused harm to Lipscomb Volunteer Fire Department and Class Members.

73. Defendants expected or should have expected their actions to have consequences throughout the United States, including in Alabama.

74. Defendants purposefully availed themselves of the privilege of conducting activities in Alabama, thus invoking the benefits and protections of its laws.

## JURISDICTION AND VENUE

75. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because it is a class action in which the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiff and most members of the proposed Class are citizens of a state different from each Defendant.

76. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, or has agents in this District, and because many of the actions giving rise to this Complaint took place within this District.

77. This Court has personal jurisdiction over Defendants because Defendants have maintained substantial contacts in Alabama or committed overt acts in furtherance of the conduct alleged herein throughout Alabama. The conduct was directed at, or had the effect of, causing injury to persons residing in, located in, or doing business in Alabama.

78. Each named Defendant has proximately injured Plaintiff and Class Members, as alleged herein.

79. Defendants expected or should have expected their actions to have consequences in Alabama. Defendants purposefully availed themselves of the privilege of conducting activities in Alabama, thus invoking the benefits and protections Alabama laws.

80. Each named Defendant derives substantial revenue from the sale of PFAS-contaminated Turnout Gear that is the subject of this action.

## FACTUAL ALLEGATIONS

### I. The History of PFAS, Turnout Gear, and Their Effects on Human Health and the Environment

81. PFAS are a class of chemical compounds, which consist of chains of carbon and fluorine that, due to the strength of the carbon-fluorine bonds, are highly resistant to being broken down in nature.[14]

82. PFAS do not exist naturally in the environment. PFAS, which are formed by artificially connecting carbon and fluorine, are known for their strength, water resistance, grease protection, and stain resistance.

83. In 1938, DuPont invented an early PFAS chemical that in the mid-1940s was coined "Teflon."[15] In the 1940s, DuPont and 3M produced PFAS on a commercial scale. Since the 1940s and 1950s, PFAS have been widely used in industrial and consumer products. The chemical stability, thermal stability, and water-repellent characteristics of PFAS have led to their use in a wide range of products. By 1948, DuPont was producing over 900 tons of PTFE per year.[16] By the 1950s, DuPont and 3M commercialized PFAS chemicals into very lucrative "performance

---

[14] *See* Nat'l Institute of Environmental Health Sciences, *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, https://www.niehs.nih.gov/health/topics/agents/pfc.

[15] *See* Science History Institute Museum & Library, The Beckman Center for the History of Chemistry, Interviews with Roy J. Plunkett, Apr. 17 and May 27, 1986, *available at* https://digital.sciencehistory.org/works/0g354g32t#tab=ohDownloads; Rudy Molinek, *The Long, Strange History of Teflon, the Indestructible Product Nothing Seems to Stick To*, SMITHSONIAN MAGAZINE (Aug. 20, 2024), *available at* https://www.smithsonianmag.com/science-nature/the-long-strange-history-of-teflon-the- indestructible-product-nothing-seems-to-stick-to-180984920/.

[16] Bevin E. Blake & Suzanne E. Fenton, *Early Life Exposure to Per- and Polyfluoroalkyl Substances (PFAS) and Latent Health Outcomes: A Review Including the Placenta as a Target Tissue and Possible Driver pf Peri- and Postnatal Effects*, TOXICOLOGY (Aug. 2020) ("Blake, 'Early Life Exposure to PFAS'"), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0300483X20302043?via%3Dihub

chemicals." PFAS have been used in a broad range of industrial and consumer products, including firefighter Turnout Gear.

84. During all relevant time, Defendants DuPont and 3M collaborated in the creation, development, manufacture, and commercialization of PFAS molecules and performance chemistries, sharing research, development, critical data, investigative results, performance measures, reports, and other highly pertinent information related to the performance, impact, and safety of PFAS.

85. PFAS do not exist naturally in the environment, and prior to Defendant DuPont and 3Ms' invention and commercialization, they had never been found in the environment or human body.

86. PFAS Turnout Gear contains substantially higher concentrations of PFAS than any other comparable industrial, occupational, or consumer apparel, gear, and PPE.

87. PFAS Turnout Gear has particularly high concentrations of toxic PFAS in the fluoropolymer moisture barriers, PFAS-based water and oil repellants, PFAS-treated aramid blends and aramid fabrics, and PFAS-containing adhesives and membranes.

88. PFAS concentrations in fluorinated polymer-treated textiles have been shown to increase with weathering.[17]

89. Defendants add PFAS toTurnout Gear in high concentrations and in multiple layers. They do so with the knowledge that the added PFAS are highly toxic and carcinogenic and would not remain contained in the PFAS Turnout Gear, but would leach into the skin of firefighters through transdermal absorption when worn, would off-gas into the air and be inhaled by

[17] Andrew Maizel et al., *Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles*, NIST Technical Note (TN) (2023), https://www.nist.gov/publications/and-polyfluoroalkyl-substances-new-firefighter-turnout-gear-textiles.

firefighters and exposed persons, would abrade and crumble onto property and be inhaled or ingested by firefighters and other exposed persons, and would otherwise migrate and contaminate the surrounding environment and property.

90. PFAS in the PFAS Turnout Gear do not remain contained or stable, rather their concentrations and migration increase dramatically when exposed to physical stressors associated with firefighting activities, such as during abrasion, heat, and weathering.[18]

91. PFAS-migration science shows that PFAS do not remain bound within the Turnout Gear; instead, they continuously shed, volatilize, abrade, and leach from the Turnout Gear during normal use, storage, handling, and laundering.

92. Once released, PFAS bind weakly to surfaces and readily contaminate station floors, gear rooms, apparatus bays, fabrics, drains, wastewater, dust, and soil.

93. Because PFAS are chemically stable, water-soluble, and highly mobile, even small releases accumulate over time, creating persistent contamination that spreads through HVAC systems, wash water, runoff, and porous building materials. This migration is inherent to the chemical properties of PFAS-treated textiles and fluoropolymer membranes, meaning contamination occurs without misuse, damage, or extraordinary conditions.

94. PFAS are known immunotoxins and carcinogenic compounds that cause multiple harmful effects, including environmental and property contamination and a substantial risk of injury to the health and safety to humans and other animals.

---

[18] Andrew Maizel, et al., *Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles*, NIST Technical Note (TN) (2023), https://www.nist.gov/publications/and-polyfluoroalkyl-substances-new-firefighter-turnout-gear-textiles.

95. In recent decades, researchers, environmentalists, and government agencies have all raised concerns regarding the persistence and toxicity of PFAS, as well as their ability to be absorbed and bioaccumulate in the human body.

96. Such concerns have prompted a dramatic increase in epidemiological studies regarding the adverse effects of PFAS exposure on human health.

97. Generally accepted peer-reviewed scientific research found that PFAS exposure, even in minute quantities, is considered hazardous to human health, and is linked to multiple serious adverse health effects in humans, including various cancers, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.

98. PFAS have been formally recognized as hazardous to the environment and human and animal health and safety by multiple U.S. and international organizations, including the U.S. Environmental Protection Agency ("EPA"), Agency for Toxic Substances and Disease Registry, National Institute of Environmental Health Sciences, Environmental Council of the States, the European Environmental Agency, Stockholm Convention on Persistent Organic Pollutants (to which the United States is a signatory), and the National Institute of Standards and Technology ("NIST").

99. The International Agency for Research on Cancer has classified one type of PFAS—perfluorooctanoic acid ("PFOA")—as "carcinogenic to humans" based on strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it and evidence it can cause cancer in lab animals.

100. PFAS exposure in any detectable amount is considered hazardous to human health and is known to cause serious adverse health outcomes, which include, but are not limited to,

various types of cancer, changes in bodily functions, reproductive harms, developmental defects, and more.

101. In September 2022, the United States Environmental Protection Agency ("EPA") initiated a proposed rulemaking to designate PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act.[19] In support, the EPA stated that "evidence indicates that these chemicals may present a substantial danger to public health or welfare or the environment[.]"

102. The EPA classified both PFOA and PFOS as likely human carcinogens.[20] In addition, the EPA concluded that there is no safe level of PFOA or PFOS exposure to humans.

103. In April 2024, the EPA announced the final National Primary Drinking Water Regulation to establish legally enforceable levels, called Maximum Contaminant Levels, for six PFAS in drinking water.[21] The EPA also finalized health-based, non-enforceable Maximum Contaminant Level Goals ("MCLGs") for those six PFAS. Notably, the MCLGs for both PFOA and PFOS were listed as "Zero."

---

[19] Environmental Protection Agency, Proposed Rule, Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 Fed. Reg. 54415 (Sept. 6, 2022), *available at* https://www.govinfo.gov/content/pkg/FR-2022-09-06/pdf/2022-18657.pdf.

[20] *See, e.g.*, Environmental Protection Agency, Human Health Toxicity Assessment for Perfluorooctanoic Acid (PFOA) and Related Salts (Apr. 2024), *available at* https://www.epa.gov/system/files/documents/2024-05/final-human-health-toxicity-assessment-pfoa.pdf; Environmental Protection Agency, "Human Health Toxicity Assessment for Perfluorooctanoic Acid (PFOA)" (Jan. 2025), *available at* https://www.epa.gov/system/files/documents/2025-01/pfoa-human-health-toxicity-assessment-infographic-factsheet.pdf

[21] *See* Environmental Protection Agency, *Per- and Polyfluoroalkyl Substances (PFAS)[:] Final PFAS National Primary Drinking Water Regulation*, *available at* https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas.

104. The World Health Organization, International Agency for Research on Cancer has classified PFOA as "carcinogenic to humans" based on strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it and sufficient evidence it can cause cancer in lab animals.

105. In 2022, the California Office of Environmental Health Hazard Assessment listed PFOA as a chemical known to the state of California to cause cancer.[22]

106. In 2023, the Yale School of Public Health conducted a PFAS study, in which two PFAS chemicals "spurred cancer cells in the lab to migrate to new positions," which was "an indication that the chemicals could contribute to cancer metastasis in living organisms."[23] The Yale article further explained that PFAS "chemicals show up in the blood of newborns, of people living in sub-Arctic Indigenous communities, in fish and mussels, even birds' eggs."[24] "No level of PFAS in the body is considered safe, and they have been linked to a litany of health problems, including cancers."[25]

107. PFAS have been formally recognized as hazardous to the environment and human and animal health and safety by multiple U.S. and international organizations, including the EPA,

[22] *See* State of California, Cal. Environmental Protection Agency, "Notice to Interested Parties Chemical Listed Effective February 25, 2022 as Known to the State of California to Cause Cancer: Perfluorooctanoic Acid," (Feb. 25, 2022), *available at* https://oehha.ca.gov/sites/default/files/media/downloads/crnr/listingnoticepfoa022522.pdf.
[23] Jenny Blair, Yale School of Medicine, *Yale Study: "Forever Chemicals" Promote Cancer Cell Migration: New research evaluates the relationship between PFAS and colorectal carcinoma* (Dec. 11, 2023), *available at* https://medicine.yale.edu/news-article/yale-study-forever-chemicals-promote-cancer-cell-migration/.
[24] *Id.*
[25] *Id. See also* David Andrews, Ph.D., Environmental Working Group, "FDA Studies: 'Short-chain' PFAS Chemicals More Toxic Than Previously Thought" (Mar. 9, 2020), *available at* 'https://www.ewg.org/news-insights/news/fda-studies-short-chain-pfas-chemicals-more-toxic-previously-thought (FDA studies regarding 6:2 FTOH, which indicate that "human health risks of this important short-chain PFAS have been significantly underestimated.").

the Agency for Toxic Substances and Disease Registry, the National Institute of Environmental Health Sciences, the Environmental Council of the States, the European Environmental Agency, the Stockholm Convention on Persistent Organic Pollutants (to which the United States is a signatory), and the National Institute of Standards and Technology ("NIST").

108. Thus, the scientific community, the federal government, the World Health Organization, and the State of California have raised significant concerns about PFAS, due to their persistence, prevalence, and toxicity.

109. Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and sold PFAS Turnout Gear.

110. 3M, Dupont and all relevant defendants expected their PFAS to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach Lipscomb and the Class Members, and their firefighters.

111. 3M, DuPont, Elevate Textiles, Gore, Milliken, Safety Components, Stedfast, and all relevant defendants expected their PFAS-containing materials to reach fire departments and firefighters without substantial change in the condition in which they were designed and manufactured, and they did so reach Lipscomb and the Class Members, and their firefighters.

## II. Firefighters' Exposure to PFAS

112. At the 2022 International Association of Fire Fighters ("IAFF") Fallen Fire Fighter Memorial, almost 75% of the names added to the wall (348 out of 469) were members who had died from occupational cancer.

113. There are established links between PFAS and testicular cancer, mesothelioma, non-Hodgkin's lymphoma, and prostate cancer. These are four of the top eight cancers that firefighters contract more than the general public.[26]

114. A 2020 study conducted by a group of physicists at the University of Notre Dame (the "Peaslee study"), found significant quantities of PFAS in every layer of both new (i.e., still in the original packaging) and used Turnout Gear collected from firefighters across the United States.[27]

115. "Startlingly, a garment-to-hand transfer of total fluorine . . . was also observed when researchers simply manipulated the textiles in [the] laboratory," which strongly supports the premise that side-chain fluoropolymers and the PFAS they bind release to the environment upon wear.[28]

116. Lead researcher Graham Peaslee commented that firefighter Turnout Gear is composed of "the most highly fluorinated textiles [he had] ever seen"[29] and that the levels of PFAS in the Turnout Gear means the firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high."[30]

---

[26] Graham F. Peaslee, et al., *Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles*, Environmental Science & Technology Letters 7, 8, 594-599 (June 23, 2020), https://pubs.acs.org/doi/10.1021/acs.estlett.0c00410.

[27] *Id.*

[28] *Id.*

[29] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS*, CHEMICAL AND ENGINEERING NEWS (July 1, 2020).

[30] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear*, BLOOMBERG LAW (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.

117. Other peer-reviewed scientific research has confirmed that elevated blood levels of PFAS have been found in firefighters with dermal absorption through direct contact between the firefighters' skin and PFAS Turnout Gear being "a key exposure route."[31] Extensive scientific research and studies have demonstrated that firefighter exposure through dermal absorption, inhalation, and ingestion from the intended and expected use, cleaning, and storage of the gear presents a substantial risk of injury to the health and safety of the firefighters so exposed, including the risk of contracting cancer and other serious diseases.[32]

118. Multiple biomonitoring studies show that firefighters often have substantially higher levels of certain PFAS in serum than the general population.[33]

119. Turnout Gear is increasingly recognized as a potential source of PFAS exposure amongst firefighters.[34]

120. In 2021, the U.S. Congress responded to growing concerns that soaring rates of occupational cancers among firefighters may be directly caused by PFAS exposure from PFAS Turnout Gear by directing NIST to study the prevalence of PFAS in Turnout Gear.

---

[31] G.E. CAMPBELL ET AL., PFAS-FREE MOISTURE BARRIERS IN STRUCTURAL FIREFIGHTING GEAR, IN TOWARD A PFAS-FREE FUTURE: SAFTER ALTERNATIVES TO FOREVER CHEMICALS, (Simona A Bălan et al. es., Nov. 17, 2023).

[32] Nur-Us-Shafa Mazumder, et al., *Firefighters' exposure to per-and polyfluoroalkyl substances (PFAS) as an occupational hazard: A review*, FRONT MATTER (2023), https://www.frontiersin.org/journals/materials/articles/10.3389/fmats.2023.1143411/full.

[33] Grace Campbell, et al., *Replacing PFAS in Firefighter Turnout Gear*, UC BERKELEY (2022), https://bcgc.berkeley.edu/sites/default/files/finalpresentation_firefighters_greenersolutions_12.5.2022.pdf; National Institute of Standards, *Researchers Pin Down PFAS Prevalence in Firefighter Gear*, NIST (May 1, 2023), https://www.nist.gov/news-events/news/2023/05/researchers-pin-down-pfas-prevalence-firefighter-gear.

[34] Andrew Maizel, et al., *Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles*, NIST Technical Note (TN) (2023), https://www.nist.gov/publications/and-polyfluoroalkyl-substances-new-firefighter-turnout-gear-textiles.

121. In or around 2022, a group of students at UC Berkeley's Center for Green Chemistry, in partnership with IAFF, conducted a semester-long study into safer alternatives to PFAS in Turnout Gear and offered multiple alternative recommendations for manufacturers. For example, the students concluded that polyethylene laminate could be used as a potential alternative to PTFE in the middle moisture barrier of Turnout Gear.

122. A pair of NIST studies, released in May 2023 and January 2024, found that Turnout Gear not only contains cancer-causing PFAS, but also that Turnout Gear releases even more PFAS when subject to simulated wear and tear.[35]

123. In September 2024, the NFPA introduced NFPA 1970-2025, restricting the use of PFAS in Turnout Gear and requiring special testing and certification.

124. In 2024, the states of Massachusetts and Connecticut passed laws 1) requiring notice beginning in 2025 to any person, local government, or state agency as to whether PFAS is contained in firefighter PPE being sold in either state; and 2) beginning on January 1, 2027, in Massachusetts, and in 2028 in Connecticut, banning the sale of any firefighter PPE containing PFAS.[36]

125. On August 15, 2025, Illinois enacted the Deputy Chief Pete Bendinelli PFAS PPE Act—named for longtime Calumet City Firefighters Local 621 member Pete Bendinelli, who died from cancer in 2025—requiring notices of PFAS in Turnout Gear beginning in 2026 and prohibiting the manufacture, sale, and distribution of PFAS Turnout Gear beginning in 2027.

---

[35] B. Hayes, *Wear and Tear May Cause Firefighter Gear to Release More 'Forever Chemicals'*, NIST (Jan 16, 2024), https://www.nist.gov/news-events/news/2024/01/wear-and-tear-may-cause-firefighter-gear-release-more-forever-chemicals.

[36] Massachusetts General Laws, Chapter 182, Acts of 2024, *An Act Relative to the Reduction of Certain Toxic Chemicals in Firefighter Personal Protective Equipment*; Connecticut Acts of 2024 Public Acts 24-59, *An Act Concerning the Use of PFAS in Certain Products*.

126. Illinois Rep. Mike Kelly, who co-sponsored the newly enacted Illinois state law, explained: "Little did we know that the actual gear designed to protect us is actually killing us."[37]

127. The Illinois PFAS Reduction Act is another worker-protection and cancer-prevention measure that acknowledges the toxicity of PFAS, the unnecessary inclusion of PFAS in Turnout Gear, the need for transparency from Defendants related to PFAS in their Turnout Gear, enhanced enforcement authority for the attorney general, and expanded Illinois Environmental Protection Agency Authority. PFAS Reduction Act, 415 Ill. Comp. Stat. 170/5, 170/20 (2025), as amended by Pub. Act 104-221.

128. In May 2024, San Francisco passed an ordinance banning PFAS in Turnout Gear and requiring replacement by June 2026. San Francisco completed the first purchase of 1,100 sets of non-PFAS turnout gear in December 2025, which will provide one set for every frontline suppression member. The cost of the new non-PFAS turnout gear exceeded $4.5 million dollars.

129. In announcing the purchase of the non-PFAS turnout gear, the San Francisco Fire Chief, Dean Crispen, underscored the importance of providing PFAS-free turnout gear: "Transitioning to PFAS-free equipment is a critical step in advancing our mission: safeguarding the public by ensuring our firefighters remain healthy and able to serve at their highest capacity . . . . By investing in the well-being of our firefighters, we strengthen the health, resilience, and safety of San Francisco as a whole."[38]

---

[37] International Association of Fire Fighters, *Illinois banns PFAS in fire fighter gear with new law*, (Aug. 29, 2025), https://www.iaff.org/news/illinois-bans-pfas-in-fire-fighter-gear-with-new-law/.

[38] Mayor Lurie Announces San Francisco Fire Department Will Become Largest in U.S. to Adopt Safe Firefighting Gear, SF.GOV (Dec. 11, 2025), https://www.sf.gov/news-mayor-lurie-announces-san-francisco-fire-department-will-become-largest-in-us-to-adopt-safe-firefighting-gear

130. IAFF affirmed the importance of laws such as those passed in Illinois, Connecticut, and Massachusetts, stating in part that: "Reducing carcinogenic exposure from protective gear is a key part of the IAFF's ongoing mission to combat the cancer epidemic in the fire service."[39]

131. The National Fallen Firefighters Foundation, International Association of Fire Chiefs, Volunteer and Combination Officers Section, and National Volunteer Fire Council have affirmed that occupational cancer is a serious threat to firefighters.

132. NIST, IAFF, and U.S. Fire Administration warn that PFAS in Turnout Gear are "potentially cancer-causing chemicals" linked to cancer and other serious effects.[40]

133. Firefighters, advocacy groups, unions, government agencies, and scientific bodies are aligned in identifying PFAS Turnout Gear as a significant PFAS-exposure pathway and a catastrophic hazard to human health.

134. PFAS cannot be used safely as a component of Turnout Gear.

135. Generally accepted peer-reviewed scientific research has found that PFAS exposure, even in minute quantities, is considered hazardous to human health, and is linked to multiple serious adverse health effects in humans, including various cancers, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, developmental defects, and pregnancy-induced hypertension.

**Defendants' Knowledge of PFAS Toxicity**

136. While the public is just beginning to discover the catastrophic effects of PFAS on the environment and human health, Defendants have known about their toxicity for decades.

---

[39] *Id.*

[40] U.S. Fire Administration, *New Information on Potential Carcinogens in Firefighter Gear* (May 11, 2023), https://www.usfa.fema.gov/blog/carcinogens-in-firefighter-gear/?utm_source=copilot.com.

Moreover, Defendants shared information amongst and between themselves while misleading the public and concealing data and information about the risks of PFAS exposure and its propensity to contaminate surrounding property.

137. Defendants knowingly and intentionally added high concentrations of PFAS to Turnout Gear, despite knowing that (1) PFAS exposure has catastrophic health effects; (2) the PFAS would migrate from the Turnout Gear and contaminate and harm surrounding property and persons; (3) PFAS concentrations and migration would increase with normal use and handling of the Turnout Gear and with exposure to the extreme stressors typically encountered as part of firefighting; and (4) PFAS was an unsafe component in Turnout Gear.

**A. Defendant 3M Has Long Known of the Dangers PFAS Causes.**

138. Defendant 3M was the largest manufacturer of PFAS in the United States from the 1940s through the early 2000s.

139. 3M has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

140. As early as the 1950s, 3M began a series of studies on the physiological and toxicological properties of PFAS, concluding that PFAS were harmful to animals, humans, and the environment. 3M discussed the findings of these studies internally and often shared them with DuPont, but it did not publicize or share the findings with any regulatory agencies. Notably:

a. In 1950, 3M documented that PFAS accumulate in the blood of mice following exposure.

b. In 1963, 3M documented PFAS as being “toxic,” stable in the environment, and “completely resistant to biological attack.”

c. By the 1970s, 3M had documented PFAS in fish and was aware that PFAS were hazardous to marine life.

d. In 1975, 3M learned there was "universal presence" of PFAS in human blood samples taken from across the United States.

e. In 1976, 3M began monitoring its employees' blood for PFAS because the company was concerned about potential health effects.

f. In 1978, 3M conducted multiple PFOA and PFOS studies on monkeys and rats. The studies showed that PFOA and PFOS affected the liver and gastrointestinal tract of the animals tested. 3M documented that PFAS "should be regarded as toxic."

g. In 1978, 3M had to abort a study when all the test monkeys died within the first few days or weeks after being given food contaminated with PFOS. The deaths were attributed to the "compound effect" of PFOS.

h. In 1979, an internal 3M report discussing the studies on PFOA and PFOS stated that PFAS were "more toxic than anticipated," recommending that "lifetime rodent studies . . . be undertaken as soon as possible."[41]

i. In 1979, an internal 3M memo concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."[42]

---

[41] Sharon Lerner, *3M Knew About Dangers of Toxic Chemicals Decades Ago, Internal Documents Show*, THE INTERCEPT (July 31, 2018).

[42] *Id.*

j. In 1981, 3M moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure" based on internal research showing that PFAS were causing birth defects in rats.

k. In 1987, 3M shared with DuPont the results of a two-year study where rats were fed a diet with added PFAS, resulting in the growth of cancerous tumors.

l. In 1989, a review of mortality data amount 3M's chemical division workers found, compared to Alabama death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

141. Section 8(e) of the Toxic Substances Control Act ("TSCA") required chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or to the environment."[43] This reporting requirement has been included in the TSCA since its enactment in 1976.[44]

142. Despite decades of alarming data, 3M did not share any of its concerns about the risks of PFAS with regulatory agencies until 1998, when it submitted a TSCA § 8(e) letter to the EPA regarding PFOS.

143. In 1998, the EPA first learned that PFAS were in the blood of the general human population. Shortly thereafter, 3M produced over 1,000 studies it had previously withheld from the EPA.

---

[43] TSCA § 8(e); 15 U.S.C. § 2607(e).

[44] *See* Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.

144. In 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for violations of the TSCA, including violations for failing to disclose studies regarding PFOS, PFOA, and other PFAS.

145. In 2022 and following a multi-year probe into both companies, California announced it was suing 3M, along with DuPont, for manufacturing PFAS with knowledge of its carcinogenic properties. In response, 3M spokesperson Carolyn LaViolette released a statement that the company "acted responsibly in connection with products containing PFAS and will defend its record of environmental stewardship."[45]

146. The same year, 3M reported to Maine that it sold more than 20,000 products containing PFAS in the United States in 2021 and 2022.[46] Those products included Scotchlite reflective tape, which can be found on all Turnout Gear purchased by Plaintiff.

147. Also in 2022, 3M announced that it would work to discontinue the use of PFAS across its product portfolio by the end of 2025. In its announcement, Mike Roman, 3M's Chairman and Chief Executive Officer, asserted that "[w]hile PFAS can be safely made and used, we also see an opportunity to lead in a rapidly evolving external regulatory and business landscape for those we serve."[47] In connection with the announcement, and prior to the alleged phase out of PFAS, 3M maintained that "3M's products are safe for their intended uses."[48]

---

[45] CNN Business, *California sues 3M, DuPont over toxic 'forever chemicals'* (Nov. 10, 2022), https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html.

[46] *See* Defend Our Health, *More 'Forever Chemicals' Reported in Products Sold in Maine*, https://defendourhealth.org/news/more-forever-chemicals-reported-in-products-sold-in-maine/#:~:text=The%203M%20Company%2C%20which%20also,%C2%AE%20Flex%20Write%20Surface%20sheets.

[47] Press Release, 3M, 3M to Exit PFAS Manufacturing by End of 2025 (Dec. 20, 2022), https://news.3m.com/2022-12-20-3M-to-Exit-PFAS-Manufacturing-by-the-End-of-2025.

[48] *Id.*

**B. Defendant DuPont has Long Known of the Dangers of PFAS.**

148. Prior to spinning off portions of the company, DuPont was the largest chemical company in the world in terms of sales.

149. DuPont has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

150. In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor worried about the company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."[49]

151. In 1954, DuPont employee R.A. Dickinson noted that he had received an inquiry regarding PFOA's "possible toxicity."[50]

152. As early as the 1960s, DuPont was repeatedly made aware, via both internal and external research and data, that PFAS were harmful to animals, humans, and the environment. Notably:

a. In 1961, a team of in-house researchers at DuPont concluded that PFOA was indeed toxic and should be "handled with extreme care." By 1962, a series of experiments by in-house researchers at DuPont had confirmed that PFOA was associated with the enlargement of various organs in rats.[51]

b. In 1965, fourteen employees at DuPont, including the then-director of Haskell Laboratories, received a memo describing preliminary studies indicating that even

---

[49] Sharon Lerner, *The Teflon Toxin: DuPont and the Chemistry of Deception,* THE INTERCEPT (Aug. 11, 2015).

[50] *Id.*

[51] Sharon Lerner, *The Teflon Toxin: DuPont and the Chemistry of Deception,* THE INTERCEPT (Aug. 11, 2015).

low doses of a related surfactant could increase the size of rat's livers, a classic response to exposure to poison.

c. In 1978, DuPont alerted employees to the results of a study done by 3M, which showed that 3M's employees were accumulating PFOA in their blood. Later in the same year, DuPont began reviewing employee medical records and measuring the levels of PFOA in the blood of its own workers, noting adverse patterns including increased rates of endocrine disorders.

d. By 1979, DuPont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA.[52]

e. In 1981, DuPont transferred women out of work assignments with potential for exposure to PFOA, alerting them to the results of a 3M study suggesting an association between PFAS exposure and birth defects.

f. By 1982, DuPont's corporate medical director had become worried about the possibility of "current or future exposure of members of the local community from emissions leaving the plant's perimeter," as he explained in a letter to a colleague.[53]

g. By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals.

h. In the 1990s, DuPont began developing an alternative to PFOA. In 1993, an interoffice memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and stayed in the body for a much shorter duration of

---

[52] *Id.*

[53] *Id.*

time. "Discussions were held at DuPont's corporate headquarters to discuss switching to the new compound. DuPont decided against it [because] [p]roducts manufactured with PFOA were an important part of DuPont's business, worth $1 billion in annual profit."[54]

i. In 1994, a small committee drafted a top-secret document, which was distributed to high-level DuPont employees around the world, discussing the need to "evaluate replacement of [PFOA] with other more environmentally safe materials" and presenting evidence of toxicity, which included a study finding an association between prostate cancer and exposure to PFOA.[55]

153. In 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested in any measurements of PFOA in general population samples." 3M informed DuPont that the half-life of PFOA was "much longer" than animal studies showed.[56]

154. In 2001, a class-action lawsuit was filed against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS were manufactured.

---

[54] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, NEW YORK TIMES MAGAZINE (Jan. 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.

[55] Sharon Lerner, *3M Knew About Dangers of Toxic Chemicals Decades Ago, Internal Documents Show*, INTERCEPT (July 31, 2018).

[56] Internal DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

155. In 2003, a consultant service with experience helping companies manage issues "allegedly related to environmental exposures," beginning with Agent Orange in 1983, wrote to DuPont in anticipation of a planned meeting:

> The constant theme which permeates our recommendations on the issues faced by DuPont is that DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. We must implement a strategy at the outset which discourages government agencies, the plaintiff's bar, and misguided environmental groups from pursuing this matter any further than the current risk assessment contemplated by the Environmental Protection Agency (EPA) and the matter pending in West Virginia.
> …
> As we understand this situation, there is currently a great deal of attention focused on the safety of perfluorochemicals generally and PFOA in particular. Specifically, due to the situation in West Virginia and the activities of the Environmental Working Group, the threat of expanded litigation and additional regulation by the EPA has become acute. In response to this threat, it is necessary for DuPont to prepare an overall technical and scientific defense strategy.[57]

156. In 2005, the EPA reached a settlement with DuPont related to violations of the TSCA for concealing the environmental and health effects of PFOA. The settlement included the largest civil administrative penalty the EPA had ever obtained under any environmental statute—$10.25 million—and further required DuPont to perform supplemental environmental projects worth $6.25 million.

157. In 2015, DuPont spun off its "performance chemicals" business, two-thirds of its environmental liabilities, and 90% of its active litigation to Chemours.

158. In 2019, Paul Kirsch, then-president of the fluoroproducts business at Chemours, testified before Congress that "DuPont designed the separation of Chemours to create a company

[57] Letter from P. Terrance Gaffney, Esq. of the Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (Apr. 29, 2003), https://cdn.toxicdocs.org/QX/QXnogko6Eaqd8wNkE3Mj7rvRo/QXnogko6Eaqd8wNkE3Mj7rvRo.pdf.

where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities."

159. In 2022 and following a multi-year probe into both companies, the state of California announced it was suing DuPont and 3M for manufacturing PFAS with knowledge of its carcinogenic properties. DuPont's response was to deny its role—claiming it had never manufactured PFOA, PFOS, or firefighting foam—and maintain that California's claims were without merit: "We believe this complaint is without merit, and we look forward to vigorously defending our record of safety, health and environmental stewardship."[58]

160. Despite decades of covering up the dangers caused by PFAS, DuPont still asserts to the public that "safety" is at its "core." In a 2019 article, DuPont posits that its founder E.I. Du Pont—"[u]nlike typical leaders of business and industry of the era" — "cared deeply about safety." Moreover, at DuPont, "[b]y the 1920s, safety claimed the same status as other operational priorities: such as quality, productivity, and profitability." DuPont further maintains, "Yes, a lot has changed in the more than two centuries since our founding. But our legacy of safety and health lives on. And as our company transforms to meet the needs of a growing population, it will continue to be a core value at DuPont."[59]

---

[58] *California sues 3M, DuPont over toxic 'forever chemicals'*, CNN BUSINESS (Nov. 10, 2022), https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html.

[59] Article, DuPont, At our core: the historical origins of safety at DuPont (May 22, 2019), *available at* https://www.dupont.com/news/safety-at-our-core.html.

### C. The Remaining Defendants' Knowledge of the Dangers of PFAS.

161. The remaining Defendants and other participants in the supply chain for PFAS Turnout Gear also knew or should have known of the dangers of PFAS.

162. Defendants have publicly acknowledged—whether in consumer advertising and/or product promotion, lobbying efforts, litigation, or otherwise—their awareness of increasing medical, environmental, governmental, and public concern regarding PFAS use and exposure.

163. Despite decades of scientific research warning of major risks caused by PFAS, Defendants have misrepresented the safety of PFAS and engaged in campaigns aimed to direct the public's attention away from the issue of PFAS in their products.

164. Indeed, in 2023, Defendant Globe's Chief Operating Officer applauded a New Hampshire bill titled the "PFAS Alternatives Act," recognized "the demand for PFAS-free materials," and stated that "Globe looks forward to continuing its long-term advocacy efforts . . . to promote this investment in innovation and pass the PFAS Alternatives Act."[60]

165. Moreover, in the early 2020s, as the toxic-exposure risk to products containing PFAS became more generally known, all Defendants became aware of an ongoing world-wide movement toward eliminating PFAS from myriad consumer products, including textiles.

166. During this period, many private companies, including Home Depot, Lowes, and Staples, began efforts to discontinue selling products containing PFAS, as did several outdoor, durable-clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co.), shoe companies (e.g., Adidas and New Balance), car-seat manufacturers (e.g.,

---

[60] *Globe Manufacturing Company Supports Bipartisan PFAS Alternatives Act*, PR NEWSWIRE (July 20, 2023), https://www.prnewswire.com/news-releases/globe-manufacturing-company-supports-bipartisan-pfas-alternatives-act-301882343.html#:~:text=Globe%20Manufacturing%20Company%20is%20a%20New%20Hampshire%2Dbased,industry%20meet%20firefighters'%20call%20for%20PFAS%2Dfree%20gear.

Britax and Graco), furniture companies (e.g., IKEA), personal-care companies (e.g., Johnson & Johnson and Oral-B), and textile-manufacturing companies.

167. For example, in June 2020, Paul Chrostowski, Ph.D., a consultant hired by Lion, took out a page in the publication Firefighter Nation, arguing that PFAS Turnout Gear is completely safe and that evidence to the contrary, such as the Peaslee study, "create[s] unnecessary fear and misunderstanding." Chrostowski argued:

> The evidence [] shows that firefighters are not exposed to PFAS at levels greater than control groups including the general population. So even if PFAS were found in their Turnout Gear, at this time there is no credible evidence that it ends up in firefighters['] bodies in amounts that would be higher than the general population. . . .
>
> At this point, it would be irresponsible to dissuade firefighters from using their protective gear out of fear of cancer. The materials used in Turnout Gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer-causing toxic chemicals present on the fireground, as well as metabolic heat stress.[61]

168. In about 2020, the City of Burlington, North Carolina enlisted Duke University scientists to investigate potential sources of PFAS that were discharging into the City's wastewater treatment plants. The City of Burlington pinpointed Elevate Textiles as "its largest source of PFAS." Thereafter, a settlement agreement required Elevate Textiles to install a closed-loop

---

[61] Paul Chrotowski, Lion Consultant, *Research and Independent Testing Shows Firefighters' Turnout Gear Remains Safe Despite Claims*, Response to Fire Rescue Magazine Article, *Fire Fire Fighter Nation* (June 3, 2020), *available at* https://www.firefighternation.com/health-wellness/research-and-independent-testing-shows-firefighters-turnout-gear-remains-safe-despite-claims/.

system to capture contaminated wastewater from its production lines, and it was announced that Elevate Textiles would phase out its use of PFAS in some of its products by June 15, 2025.[62]

169. Likewise, Fire-Dex recently defended an action brought by its insurer seeking to effectively avoid its defense obligation for PFAS-related claims against the company. In its Complaint, the insurer alleged that Fire-Dex had been repeatedly named in lawsuits brought by firefighters and/or their spouses alleging bodily injuries due to PFAS exposure.

170. Gore advertises its "Materials Stewardship," that its in-house scientists "are active participants in the scientific community, lending their expertise, research and time to broaden the understanding of [PFAS]."

171. Despite Gore's assertions about its stewardship, the State of Maryland filed suit against Gore, arising from decades of PFAS environmental contamination.

172. Honeywell has lobbied state officials, submitted comments, and indicated its intent to seek exemptions regarding a recently passed Alabama law, which will take full effect in 2032, banning all non-essential uses of PFAS in eleven product categories.

173. In 2023, Honeywell (along with manufacturing company Saint Gobain) reached a $45 million agreement with New York's Department of Environmental Conservation to implement a new water supply for the Hoosick Falls Village Water System and reimburse state taxpayers for the cost of the state's response to PFOA contamination in Hoosick Falls, New York.

174. In or around 2021, Stedfast spokesperson Mike Salvato presented on the topic of PFAS, PFOS, PFOA, and PTFE in Turnout Gear, acknowledging that "PFOS and PFOA have

---

[62] Lisa Org, *Burlington will curb PFAS discharges, per legal settlement with Haw River Assembly*, NC NEWSLINE (Aug. 2, 2023), *available at* https://ncnewsline.com/2023/08/02/burlington-will-curb-pfas-discharges-per-legal-settlement-with-haw-river-assembly/.

been found to be 'potentially harmful,'" but arguing that "[i]t is important to consider the trade-off of performance with perceived health risk if eliminating PFAS in gear." Salvato acknowledged that the "Peaslee study shows that turnout gear may 'shed' some PFAS" but argued "[o]rganizations should properly put into perspective the assumed risk with PFAS in turnout gear with other risks fire fighters face with the current materials available, PFAS is essential."[63]

175. Facing increasing medical, environmental, governmental, and public concern regarding the dangers caused by PFAS exposure, Defendants have publicly acknowledged—whether in consumer advertising and/or product promotion, lobbying efforts, litigation, or their denials—their awareness of the substantial injuries caused by PFAS.

176. Moreover, in the early 2020s, as the toxic exposure risk to products containing PFAS became more generally known, Defendants became aware of an ongoing world-wide movement toward eliminating PFAS from myriad consumer products, including textiles. During this period, many private companies, including Home Depot, Lowes, and Staples, began efforts to discontinue selling products containing PFAS, as did several outdoor, durable clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co.), shoe companies (e.g., Adidas and New Balance), car seat manufacturers (e.g., Britax and Graco), furniture companies (e.g., IKEA), personal care companies (e.g., Johnson & Johnson and Oral-B), and textile manufacturing companies.

177. In 2023, Globe's Chief Operating Officer "applaud[ed]" a New Hampshire bill titled the "PFAS Alternatives Act," and recognized "the demand for PFAS-free materials," stating

---

[63] *See* Mike Salvato, Stedfast, Inc., Presentation: "PFAS, PFOA, PFOS, PTFE, and Your Turnout Gear," *available at* https://legacy-assets.eenews.net/open_files/assets/2021/02/16/document_gw_10.pdf.

that "Globe looks forward to continuing its long-term advocacy efforts . . . to promote this investment in innovation and pass the PFAS Alternatives Act."[64]

178. All Defendants knew or should have known that Turnout Gear containing PFAS posed a substantial risk of injury to the health and safety of Plaintiff, Class Members' and firefighters, in that it placed them at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

179. All Defendants knew or should have known that exposure to PFAS-contaminated materials and PFAS places humans at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

180. All Defendants knew or should have known that the Turnout Gear either treated with and containing PFAS Chemicals or contained in the component parts of Turnout Gear that they manufactured, distributed, marketed, offered for sale, or sold would be used in ways in which Plaintiff and Class Members' firefighters would be exposed to the toxic properties of PFAS through dermal absorption, inhalation, and ingestion.

## IV. Defendants Conspired to Conceal PFAS Risks from the Public.

181. Defendants knew that Turnout Gear containing PFAS was dangerous to Plaintiff and proposed Class Members' firefighters, in that it placed them at an increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers. However, Defendants failed to disclose to Plaintiff, Class Members, or their firefighters the full extent of the health risks, and they failed to provide adequate warnings to Plaintiff, Class Members,

---

[64] *Globe Manufacturing Company Supports Bipartisan PFAS Alternatives Act*, PR NEWSWIRE (July 20, 2023), *available at* https://www.prnewswire.com/news-releases/globe-manufacturing-company-supports-bipartisan-pfas-alternatives-act-301882343.html#:~:text=Globe%20Manufacturing%20Company%20is%20a%20New%20Hampshire%2Dbased,industry%20meet%20firefighters'%20call%20for%20PFAS%2Dfree%20gear.

and their firefighters regarding the substantial risk of injury to firefighters posed by PFAS contaminated Turnout Gear.

182. Quite the opposite—Defendants continued to misrepresent the safety of Turnout Gear containing PFAS and engaged in campaigns, such as greenwashing, that were aimed to misinform and lessen public and regulatory concern regarding PFAS.

183. For instance, the common purpose and conduct of 3M and DuPont to cover up the truth about PFAS and PFAS-laden products is shown by a 3M MSDS that 3M had sent to DuPont in 1997.

184. The United States has long sought to protect workers who have been exposed to hazardous chemicals in the work environment. In November 1983, the Occupational Safety and Health Administration ("OSHA") adopted the Hazard Communication Standard, which requires chemical manufacturers and importers to evaluate the hazards of chemicals that they produce and distribute. The Hazard Communication Standard requires information about hazards and protective measures to be disseminated on container labels and MSDSs. All employers with employees exposed to regulated chemicals must provide access to the labels and the MSDSs. Employers using the manufactured chemicals must also train employees to understand the information provided by the MSDSs and the labels and how to use the information to protect themselves. The Hazard Communication Standard covers all chemicals in American workplaces.[65]

[65] "Hazard Communication in the 21st Century Workforce," Hearing Before the Subcommittee on Employment, Safety, and Training of the Committee on Health, Education, Labor, and Pensions, United States Senate (Mar. 25, 2004), *available at* https://www.govinfo.gov/content/pkg/CHRG-108shrg92926/html/CHRG-108shrg92926.htm.

185. In February 1997, 3M sent to DuPont a MSDS that stated:

> CANCER WARNING: Contains a chemical which can cause cancer. (3825-24-1) (1983 and 1993 studies conducted jointly by 3M and Dupont).[66]

186. Instead of informing the public of the dangers caused by PFAS, 3M and DuPont suppressed the February 1997 MSDS as part of the wrongful conduct of the PFAS Cover-up Enterprise. Indeed, a former Minnesota Attorney General testified before a United States House Committee about a lawsuit by Minnesota against 3M for PFAS pollution. In part, she testified about the 1997 MSDS that 3M gave to DuPont.[67] After quoting from the document, she testified that "3M removed the label that same year and for decades sold PFAS products without warning the public of its dangers."[68] While the former Attorney General's testimony concerned 3M, the same is true of DuPont, which associated with 3M to suppress the truth and to sell PFAS products for decades without warning the public of the dangers of those products.

187. Nevertheless, Chemours has maintained and publicly advertised that "[w]e take very seriously our obligation to manage the PFAS compounds in our manufacturing processes in

---

[66] 3M, Specialty Chemicals Division, Material Safety Data Sheet (Feb. 7, 1997), *available at* https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf and https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1471.pdf.

[67] Testimony of Lori Swanson, Former Minn. Attorney General, Before the Committee on Oversight and Reform (Sept. 10, 2019), *available at* https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf.

[68] *Id.*

a responsible manner and our commitment to eliminate at least 99% of our PFAS air and water emissions from our manufacturing processes by 2030."[69]

188. In 2017, Lion's President wrote a letter to the Editor of THE COLUMBUS DISPATCH, demanding the newspaper's retraction of a PFAS news story and denying that its Turnout Gear "posed any health risks to firefighters."[70] Even so, Lion admitted that its manufacturing partners "used PFOA in their manufacturing process as a processing aid," so "it is possible that trace amounts may have been present in Lion's turn-out gear."

189. In approximately 2019, Lion issued a "Customer Safety Alert" for "PFOA and Turnout Gear," asserting that "[y]our Lion Turnout Gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."[71]

190. Moreover, in about 2021, Paul Chrostowski, Ph.D., the Lion consultant, created a presentation, "PFAS and LION Turnout Safety Gear,"[72] in which he asserted that PFAS "[l]evels in firefighters similar to general population and not linked to turnout gear." Even so, Dr.

---

[69] Chemours, Our Commitment to Responsible Chemistry, *available at* https://www.chemours.com/en/sustainability/sustainability-safety/our-commitment-to-pfas-stewardship.

[70] Stephen A. Schwartz, President, Lion Group, Inc., Letter to Alan D. Miller, Editor, THE COLUMBUS DISPATCH (Oct. 30, 2017), *available at* https://static.ewg.org/reports/2020/pfas-firefighter-timeline/2017_-_LION_letter.pdf?_ga=2.60849196.1253861871.164907068 -2123137255.1639662520.

[71] Lion, Customer Safety Alert: PFOA and Turnout Gear, *available at* https://www.fireengineering.com/wp-content/uploads/2020/09/pfoa-lion.pdf.

[72] Paul Chrostowski, Ph.D., QEP, Paul Chrowstowski LLC, Presentation: "PFAS and LION Turnout Gear Safety," *available at* https://peer.org/wp-content/uploads/2021/07/document_gw_11.pdf

Chrostowski acknowledged that in LION Turnout Gear, both "[o]lder samples detected PFOA (up to 23.5 ppb)," and that [n]ewer samples max PFOA was 0.96 ppb."

191. In 2019, Gore issued a public statement, asserting that "the potential exposures and associated risks of cancer effects from PFOA alternatives and non-polymeric perfluoroalkyl substances in Gore components [Turnout Gear] are insignificant."

192. Fire-Dex maintains and publicly advertises that its Turnout Gear is made with "the best materials the industry has to offer" and provides the specific benefit of "reduc[ing] [] carcinogen exposure." Fire-Dex advertises that the company goes "beyond industry standards to ensure a proper fit for your comfort and safety," making its turnout gear products "key to keeping your crew safe!"

193. Globe maintains and publicly advertises that the company is "committed to firefighter health & safety," and that:

> At [Globe], your health, safety and well-being are what drive us to not only develop technologically-advanced safety equipment to help protect you on the job, but to advocate for your well-being. In fact, after more than 100 years in business, our mission remains unchanged: that men and women may work in safety and live in health.

194. In addition, in a NEW YORK TIMES article published in 2021, Gore maintained that its Turnout Gear products were safe.[73]

195. In 2022, 3M publicly stated that it was not necessary or appropriate to declare any PFAS hazardous.

196. Moreover, Defendants have repeatedly represented to Plaintiff, Class Members, their firefighters, and the public that their products were safe for their intended uses, including the

[73] *See* Hiroko Tabuchi, *Firefighters Battle an Unseen Hazard: Their Gear Could Be Toxic*, N.Y. TIMES, Jan. 26, 2021 (updated Oct. 20, 2021), *available at* https://www.nytimes.com/2021/01/26/climate/pfas-firefighter-safety.html.

ways in which Plaintiff, Class Members, and their firefighters were expected to use, clean, and store the Turnout Gear. Meanwhile, Defendants' warning labels have not adequately disclosed the products' risks. Rather, Defendants have repeatedly touted the safety of their products and firefighters' health.

197. For example, DuPont maintained and publicly advertised that Turnout Gear manufactured with DuPont's materials "work hard to help keep your professionals safe, inside and out," "help protect professionals even when the fire is out," and "are helping keep first responders safe."

198. In addition, MSA Safety, which is Globe's parent company, maintains and publicly advertises that the company is "committed to firefighter health & safety," and that:

> At [Globe], your health, safety and well-being are what drive us to not only develop technologically-advanced safety equipment to help protect you on the job, but to advocate for your well-being. In fact, after more than 100 years in business, our mission remains unchanged: that men and women may work in safety and live in health.[74]

199. Lion maintains and publicly advertises that the company "makes the gear emergency service providers, civilian responders and militaries need to stay safe in the line of duty," emphasizing that "[w]hen it comes to firefighting, safety is a top concern."

200. Honeywell maintains and publicly advertises that the company's "safety solutions protect the future of 500 million workers" and that its fire fighter turnout gear is "[d]esigned to provide safety," referring to its turnout gear products as "the pioneer of safety by design."

201. Defendants have made broad statements promoting the safety of their products, while they have worked together for decades on Firefighter PPE that contains dangerous levels of toxic PFAS chemicals.

---

[74] MSA Safety, Inc., H2H: Head to Toe Health, https://us.msasafety.com/firefighter-health?locale=en.

## V. Defendants Failed to Provide Adequate Warnings of PFAS Risks.

202. As alleged above, the PFAS Turnout Gear purchased and/or paid for by Plaintiff and Class Members did not contain appropriate labeling information or warnings:

a. Indicating that the gear contained or may contain PFAS;

b. Indicating that the gear specifically contained or may specifically contain PFOA or PFOS;

c. That heat exposure to PFAS significantly increases the risk of toxic compounds being released into the air;

d. That newer PFAS can degrade into persistent, hazardous PFAS compounds;

e. Regarding the health risks associated with exposure to PFAS;

f. Regarding the health risks associated with exposure to PFOA or PFOS; or

g. That the Turnout Gear contained PFAS or PFAS-containing materials, and that handling, wearing, or using the Turnout Gear as it was intended to be handled, worn, cleaned, used or stored can result in exposure to PFAS and adverse effects to human health.

## VI. Defendants Had the Ability to Design Safer Turnout Gear.

203. Despite Defendants' expressed position that PFAS were "essential" in Turnout Gear, at all relevant times, it was technologically and economically feasible to design and manufacture Turnout Gear that did not contain PFAS chemicals.

204. In fact, Defendants had the knowledge and technical ability to design and manufacture PFAS-free chemicals and materials that could be incorporated into Turnout Gear to ensure that the Turnout Gear had appropriate durable water-repellent and heat-resistant characteristics.

205. In or around 2021, Gore announced its upcoming launch of a PFAS-free fabric-waterproofing technology, which was praised for its apparent potential to "greatly increase the availability of PFAS-free water-repellant garments."[75]

206. In or around 2021, PPE fabric manufacturer Fire-Dex, in conjunction with Milliken, as well as Honeywell announced the introduction PFAS-free material options for Turnout Gear.

207. In fall 2022, a group of students at UC Berkeley's Center for Green Chemistry, in partnership with the IAFF, conducted their own semester-long study into safer alternatives to PFAS in Turnout Gear and were able to offer multiple, alternative recommendations for manufacturers. For example, the students concluded that polyethylene laminate could be used as a potential alternative to PTFE in the middle moisture barrier of firefighter Turnout Gear.[76]

208. At least as of 2025, PFAS-free Turnout Gear was available in the marketplace that complied with the water-repellent and heat-resistant characteristics and for firefighter PPE, which are illustrated in applicable NFPA standards.

## VII. Defendants Failed to Disclose the Unfit Dangerous Nature of the Turnout Gear.

209. During the relevant time period, Plaintiff and the Class Members, in the ordinary course, purchased, paid for, or otherwise provided Turnout Gear that contained PFAS chemicals and/or included textiles or component parts treated or contaminated with PFAS chemicals that

---

[75] Julia John, *WL Gore to release PFAS-free waterproof material for apparel*, ENHESA (Oct. 4, 2021).

[76] Grace Campbell, *et al.*, *Replacing PFAS in Firefighter Turnout Gear*, UC BERKELEY (2022), *available at* https://bcgc.berkeley.edu/sites/default/files/finalpresentation_firefighters_greenersolutions_12.5.2022.pdf

Defendants manufactured, distributed, marketed, offered for sale, sold, or otherwise provided to Plaintiff and Class Members.

210. At the time of purchase of such PFAS treated or contaminated Turnout Gear, Defendants did not adequately disclose or warn Plaintiff or the Class Members regarding the full extent of the PFAS treatment and contamination of the PPE; the full nature and extent of the substantial threat and risk of harm to the health and safety of firefighters and others posed by the use, cleaning, and storing of the PFAS treated and contaminated Turnout Gear; and did not adequately disclose to Plaintiff and the Class Members that the Turnout Gear was not merchantable; was not fit for its intended use; was unreasonably dangerous to firefighters and others from its expected use, cleaning, and storage; and that the Turnout Gear should not be purchased or otherwise acquired by Plaintiff or the Class Members.

211. Defendants misrepresented through public statements and concealment of information known to them that PFAS treatment or contamination of PPE did not render firefighter PPE unmerchantable, unfit, unsafe and unreasonably dangerous for its intended use, expected clearing, and storage.

212. Defendants failed to inform Plaintiff and the Class Members of the inherent danger and substantial risk to health and safety posed by the PFAS treated and/or contaminated Turnout Gear, and of the risk of injury or harm to human health posed by the expected use, cleaning, and storage of the Turnout Gear.

213. In acting as alleged in this Complaint, Defendants deprived Plaintiff and the Class Members of the information necessary for them to make informed business decisions regarding purchasing the Turnout Gear acquired during the relevant time period and to take the reasonable

and necessary steps to protect Plaintiff, Class Members, their firefighters and others exposed to the danger posed by the Turnout Gear resulting from expected use, cleaning and storage.

**CLASS ALLEGATIONS**

214. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of itself and the following (the "Class"):

> All political subdivisions of each of the States of the United States, including but not limited to, counties, cities, municipalities, fire districts, and other public or private entities in the United States that have purchased, paid for, acquired and/or used firefighter Turnout Gear that contained PFAS that was treated or contaminated with PFAS resulting from Defendants' manufacturing, assembling, distribution, marketing, offering for sale, or sales activity.
>
> Or, in the alternative:
>
> All counties, cities, municipalities, fire districts, and other public or private entities in the State of Alabama that, during the relevant time-period, purchased Turnout Gear that contained PFAS or was treated or contaminated with PFAS resulting from Defendants' manufacturing, assembling, distribution, marketing, offering for sale, and/or sales activity.

Plaintiff reserves the right to expand, narrow, or otherwise modify or refine the Class definition based on additional information obtained through further investigation and discovery or to address or accommodate any concerns raised by the Court.

215. Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiff and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

216. **Ascertainability.** The proposed Class is readily ascertainable because it is defined clearly and uses objective criteria, thereby permitting Class Members to determine if they are part of the Class. Members of the Class can be identified readily through records and information in Defendants' possession, custody, or control.

217. **Numerosity.** The Class is so numerous that joinder of individual members is impracticable. Although the exact number of members of the Class is not known to Plaintiff at this time, on information and belief, there are likely well over fire departments

218. **Commonality and Predominance.** Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Class, including, but not limited to:

a. Whether Defendants violated the Racketeering Influenced and Corrupt Organization Act ("RICO");

b. Whether Defendants' conduct resulted in the availability of Turnout Gear in the marketplace that was unreasonably dangerous for its intended and expected use, handling, cleaning, and storage;

c. Whether Class Members suffered the same or substantially similar injury or damage;

d. Whether Defendants are liable under RICO;

e. Whether there is an enterprise within the meaning of RICO;

f. Whether equity and law require that Defendants collectively share in the cost of the remedy, including (1) the retrieval, removal, and proper disposal of PFAS-treated or contaminated Turnout Gear; and (2) providing each Class Member with

sufficient funds to replace its contaminated Turnout Gear with Turnout Gear that meets the industry standards.

219. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Class. Plaintiff and Class Members sustained damages arising out of Defendants' conduct as described herein. The injuries of Plaintiff and Class Members were directly caused by Defendants' wrongful conduct, and Plaintiff and Class Members assert the same claims for relief.

220. **Adequacy.** Plaintiff has, and will continue to, fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest that is antagonistic to those of the Class, and Defendants have no known defenses unique to Plaintiff. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of the other members of the Class.

221. **Substantial Benefits.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action is manageable. Plaintiff knows of no special difficulty to be encountered in this action that would preclude its maintenance as a class action.

### A. Tolling and Estoppel of Applicable Statute of Limitations

222. For decades, Defendants had knowledge of the hazards to the health and safety of Plaintiffs, the Class Members, and their firefighters, and to their respective property, caused by exposure to PFAS.

223. By the 1960s and continuing for decades, Defendants conducted internal studies that demonstrated the toxicity of PFAS chemicals. In addition, newer PFAS can degrade into persistent, hazardous PFAS compounds.

224. Defendants knew or should have known that they were creating an unacceptable health risk to Plaintiff, Class Members, and their firefighters by designing, manufacturing, and selling Turnout Gear that was treated with PFAS.

225. Defendants intentionally concealed this information from Plaintiff, Class Members, their firefighters, and the public.

226. Defendants intentionally and continuously misrepresented the safety of the Turnout Gear treated with PFAS, PFAS-laden materials, and PFAS, assuring Plaintiff, Class Members, their firefighters, as well as the public and governmental authorities that the Turnout Gear treated with PFAS, PFAS-laden materials, and PFAS were safe.

227. At all relevant times, Defendants did not adequately disclose or warn Plaintiff and Class Members of the true nature of the dangers posed by PFAS-laden firefighter Turnout Gear.

228. Neither Plaintiff nor Class Members, through the exercise of reasonable care or due diligence, could have discovered the true nature of Defendants' products as alleged herein. Further, Plaintiff and Class Members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

229. For these reasons, all applicable statutes of limitations have been tolled by the discovery rule with respect to claims asserted by Plaintiff and Class Members.

**B. Fraudulent Concealment Tolling**

230. For decades, Defendants concealed their conduct and the existence of the claims asserted herein from Plaintiff and Class Members.

231. Because of Defendants' active and ongoing concealment of the hazards of PFAS—as well as the unique dangers posed to firefighters through dermal absorption, ingestion, and inhalation of PFAS through off-gassing and migration—Plaintiff and the Class Members could not have reasonably discovered the causes of action alleged herein.

232. For this reason, applicable limitations on actions and claims, at law or in equity, asserted herein or any statute of limitations that otherwise may apply to the claims of Plaintiff or Class Members should be tolled.

## LEGAL CLAIMS

### COUNT I
### Violation of RICO
### 18 U.S.C. § 1962(c), (d)

233. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

234. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

235. All Defendants are "persons" under 18 U.S.C. § 1961(3) because they can hold, and do hold, "a legal or beneficial interest in property."

236. Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate any of the provisions of subsection …(c)."

237. For years, each of the Defendants created and participated in the affairs of an illegal enterprise. The PFAS Cover-Up Enterprise's purpose was to conceal the dangers of the Defendants' PFAS products, including PFAS-laden products sold to Turnout Gear manufacturers. As set forth below, the acts of Defendants in furtherance of the PFAS Concealment Enterprise violate Section 1962(c) and (d).

**a. The Members of the PFAS Cover-Up Enterprise.**

238. The Defendants are all members of the PFAS Cover-Up Enterprise.

Concealment of the dangers of PFAS benefitted the enterprise in several ways. First, many of the Defendants, including 3M, and DuPont, make other PFAS-laden products. To disclose the dangers of PFAS in Turnout Gear would have called into question the safety of other products they manufactured. Second, DuPont was facing increasing and substantial potential liability for environmental damage their manufacturing of PFAS caused in the United States and other countries. Therefore, Defendants were thus unwilling to state the truth about the dangers of PFAS in Turnout Gear so as to avoid fueling the fire about their products. Third, if Defendants had disclosed the dangers caused by PFAS in Turnout Gear, other firms would have developed PFAS-free Turnout Gear earlier.

239. 3M had substantial control over, and participated in, the affairs of the PFAS Cover-Up Enterprise by:

Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about PFAS and PFAS Turnout Gear to Plaintiff, Class Members,their firefighters, and the public;

a. Concealing from government regulators the truth about the dangers of PFAS Turnout Gear;

b. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

c. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS Turnout Gear.

240. DuPont and Chemours had substantial control over (and controlled) the affairs of the PFAS Cover-Up Enterprise by:

a. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about Turnout Gear to fire departments, Plaintiff, Class Members, their firefighters, and the public;

b. Concealing from government regulators the truth about the dangers of PFAS Turnout Gear;

c. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

d. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in Turnout Gear.

241. The PFAS Fabric Producer Defendants had substantial control over (and participated in) the affairs of the PFAS Cover-Up Enterprise by:

a. Manufacturing, distributing, and selling PFAS Turnout Gear;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about Turnout Gear to Plaintiff, Class Members, their firefighters, and the public;

c. Introducing PFAS Turnout Gear into the stream of U.S. commerce;

d. Concealing from government regulators the truth about the dangers of PFAS Turnout Gear;

e. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

f. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS Turnout Gear.

242. The PFAS Turnout Gear Assembler Defendants had substantial control over (and participated in) the affairs of the PFAS Cover-Up Enterprise by:

a. Manufacturing, distributing, and selling Turnout Gear to fire departments and others;

b. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about Turnout Gear to Plaintiff, Class Members, their firefighters, and the public;

c. Introducing PFAS Turnout Gear into the stream of U.S. commerce;

d. Concealing from government regulators the truth about the dangers of PFAS Turnout Gear;

e. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

f. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS Turnout Gear.

243. All members of the PFAS Cover-Up Enterprise directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present because such information lies in Defendants' and others' hands.

244. All members of the PFAS Cover-Up Enterprise served the common purpose of concealing the emissions dangers of PFAS-laden products from Plaintiff, Class Members, their firefighters, and the public. Each member of the PFAS Cover-Up Enterprise shared in its bounty (i.e., by continuing to sell PFAS-laden products for decades even though they knew that PFAS in those products posed grave dangers).

245. In addition, 3M makes dozens of products that contain PFAS, and 3M faced billions of dollars in potential liabilities. As noted in its Fiscal Year 2024 SEC Form 10-K, its PFAS liability is substantial and was, for years, a liability 3M sought to concede:

> The Company has been voluntarily cooperating with various local, state, federal (primarily the U.S. Environmental Protection Agency (EPA)), and international agencies in their reviews of the environmental and health effects of certain PFAS produced by the Company. 3M currently is defending lawsuits concerning various PFAS-related products and chemistries, and is subject to unasserted and asserted claims and governmental regulatory proceedings and inquiries related to the production and use of PFAS in a variety of jurisdictions, as discussed in Note 19, "Commitments and Contingencies," within the Notes to Consolidated Financial Statements. 3M has seen increased public and private lawsuits being filed on behalf of states, counties, cities, and utilities alleging, among other things, harm to the general public and damages to natural resources, some of which are pending in the AFFF multi-district litigation and some of which are pending in other jurisdictions. Various factors or developments in these and other disclosed actions could result in future charges that could have a material adverse effect on 3M. For example, the Company recorded a pre-tax charge of $897 million, inclusive of legal fees and other related obligations, in the first quarter of 2018 with respect to the settlement of a matter brought by the State of Alabama involving the presence of PFAS in the groundwater, surface water, fish or other aquatic life, and sediments in the state. In addition, as described in greater detail in Note 19, "Commitments and Contingencies," within the Notes to Consolidated Financial Statements, in June 2023, the Company entered into a class-action settlement ("PWS Settlement") to resolve a wide range of drinking water claims by public water suppliers in the

> United States regarding PFAS. The court approved that settlement in March 2024. 3M will pay $10.5 billion to $12.5 billion in total to resolve the claims released by the PWS Settlement, with payments to be made from 2024 through 2036, in exchange for a release of certain claims, as described further in Note 19. Unexpected events related to the PWS Settlement, including the potential impact of the PWS Settlement on other PFAS-related matters, could have a material adverse effect on the Company's results of operations, cash flows or consolidated financial position. In addition, as previously disclosed, in connection with the separation of Solventum, the Company agreed to retain liabilities related to PFAS for certain products sold by the Company's health care businesses prior to the separation and by Solventum for a limited period of time following the separation.
>
> Governmental inquiries, lawsuits, or laws and regulations involving PFAS could lead to the Company incurring liability for damages or other costs, civil or criminal proceedings, the imposition of fines and penalties, or other remedies, including orders to conduct remediation, as well as restrictions on or added costs for business operations going forward, including in the form of restrictions on discharges at manufacturing facilities, requiring the installation of control technologies, suspension or shutdown of facility operations, switching costs in seeking alternative sources of supply, potential customer damage claims due to supply disruptions or otherwise, restoration of and/or compensation for damages to natural resources, personal injury and property damages, and reporting requirements or bans on PFAS and PFAS-containing products manufactured by the Company. The Company may also record asset retirement obligations, some of which may be material, depending in part on how the Company manages related assets in connection with these activities. Any of the foregoing could have a material adverse effect on the Company's results of operations, cash flows or consolidated financial position.

246. Likewise, Globe, according to its parent company's Fiscal Year 2024 10-K, is facing substantial liabilities that it fought for years to concede:

> Globe, a subsidiary of the Company, is defending claims in which plaintiffs assert that certain products allegedly containing per- and polyfluoroalkyl substances ("PFAS") have caused harm, including injury or health issues. PFAS are a large class of substances that are widely used in everyday products. Specifically, Globe builds firefighter Turnout Gear from technical fabrics sourced from a small pool of specialty textile manufacturers. These protective fabrics have been tested and certified to meet current National Fire Protection Association safety standards, and some of them as supplied to Globe contain or historically have contained PFAS to achieve performance characteristics such as water, oil, or chemical resistance.
>
> Globe believes it has valid defenses to these claims. These matters are at a very early stage with numerous factual and legal issues to be resolved. Defense costs relating to these lawsuits are recognized in the Consolidated Statements of Income as incurred. Globe is also pursuing insurance coverage and indemnification related

> to the lawsuits. As of February 4, 2025, Globe was named as a defendant in approximately 663 lawsuits comprised of about 8,801 claims, predominantly styled as individual personal injury claims and including two putative class actions. Certain of these lawsuits include MSA Safety Inc. or other Globe affiliates as defendants.
>
> MSA LLC is also a defendant in a number of PFAS lawsuits predominantly relating to Aqueous Film-Forming Foam. The Purchaser assumed responsibility for these and any similar future claims specific to MSA LLC, including such claims that have been or may be brought against MSA Safety Inc. or its subsidiaries, under the terms of the Purchase Agreement governing the Company's January 5, 2023, divestiture of MSA LLC. Further information about the transaction can be found in the Company’s Current Report on Form 8-K filed on January 6, 2023.

**b. RICO Predicate Acts.**

247. To carry out or attempt to carry out the scheme to defraud, the members of the PFAS Cover-Up Enterprise conducted or participated in the conduct of the affairs of that enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

248. Specifically, the members of the PFAS Cover-Up Enterprise participated in the scheme to defraud by using mail, telephone, and the Internet to transmit writings travelling in interstate or foreign commerce.

249. The PFAS Cover-Up Enterprise members’ use of the mails and wires include the transmission, delivery, or shipment of the following by the members or third parties that were foreseeably caused to be sent as a result of the PFAS Cover-Up Enterprise members’ illegal scheme:

a. PFAS products to fire departments and others;

b. Documents and communications accompanying the shipments of PFAS products to fire departments and others;

c. False or misleading MSDSs, Safety Data Sheets, Technical Data Sheets, and product labels;

d. Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of Turnout Gear;

e. Documents intended to facilitate the manufacture and sale of PFAS-laden products, including invoices, shipping records, reports, and correspondence;

f. Documents to process and receive payment for PFAS Turnout Gear, including invoices and receipts;

g. Payments to the PFAS Cover-Up Enterprise members for PFAS Turnout Gear;

h. Deposits of proceeds from sales of PFAS Turnout Gear by PFAS Cover-Up Enterprise members; and

i. Other documents and things, including electronic communications.

250. The PFAS Cover-Up Enterprise members used the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein.

251. The PFAS Cover-Up Enterprise members also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

252. The mail and wire transmissions described herein were made in furtherance of the PFAS Cover-Up Enterprise members' scheme and common course of conduct to deceive

regulators and consumers and lure Turnout Gear manufacturers into purchasing products that the PFAS Cover-Up Enterprise members knew emit PFAS.

253. Many of the precise dates of the fraudulent uses of U.S. Mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the PFAS Cover-Up Enterprise members' books and records. But Plaintiff has described the types of predicate acts of mail and wire fraud and, in some instances, occasions on which the predicate acts of mail and wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

254. The PFAS Cover-Up Enterprise members have not undertaken the practices described herein in isolation but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the PFAS Cover-Up Enterprise members conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the PFAS Cover-Up Enterprise members in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and minimize losses for the PFAS Cover-Up Enterprise members and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

255. The PFAS Cover-Up Enterprise members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

256. To achieve their common goals, the PFAS Cover-Up Enterprise members hid from the public, fire departments, and others the emission dangers of PFAS.

257. The PFAS Cover-Up Enterprise members, with knowledge and intent, have agreed to the overall objectives of the PFAS Cover-Up Enterprise and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and selling PFAS-laden products to Turnout Gear manufacturers.

258. The PFAS Cover-Up Enterprise members' conduct in furtherance of this scheme was intentional. Plaintiff and the Class members were harmed as a result of the PFAS Cover-Up Enterprise members' intentional conduct. Plaintiff, the Class Members, regulators, and consumers, among others, relied on the PFAS Cover-Up Enterprise members' material misrepresentations and omissions.

259. As described herein, the PFAS Cover-Up Enterprise members engaged in a pattern of related and continuous predicate acts for many years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiff and the Class Members and obtaining significant monies and revenues from them and through them while providing PFAS-laden products to Turnout Gear manufacturers and others. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

260. The predicate acts all had the purpose of generating significant revenue and profits for the PFAS Cover-Up Enterprise members at the expense of Plaintiff and the Class Members. The predicate acts were committed or caused to be committed by the PFAS Cover-Up Enterprise members through their participation in the PFAS Cover-Up Enterprise and in furtherance of its fraudulent scheme.

261. The PFAS Cover-Up Enterprise members had a duty to disclose the truth about the emissions dangers of PFAS-laden products to Turnout Gear manufacturers, consumers, and others

but never did so. The Hazard Communication Standard requires that the chemical manufacturers, distributors, or importers provide Safety Data Sheets ("SDSs") (formerly Material Safety Data Sheets) for each hazardous chemical to downstream users to communicate information on these hazards.[77] "The information contained in the SDS is largely the same as the [Material Safety Data Sheets], except now the SDSs are required to be presented in a consistent user-friendly, 16-section format."[78]

262. On information and belief, Plaintiff alleges that the PFAS Cover-Up Enterprise members never disclosed the emissions dangers of PFAS in PFAS-laden products in SDSs and Material Safety Data Sheets for PFAS-laden products that they sold to Turnout Gear manufacturers and others.

263. The PFAS Cover-Up Enterprise members' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiff and the Class Members, all of whom are entitled to bring this action for three times their actual damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). Each PFAS Cover-Up Enterprise member knew, understood, and intended for fire departments to purchase PFAS Turnout Gear sold to Plaintiff and the Class Members, knowing that the PFAS emitted by Turnout Gear would injure Plaintiff and the Class Members. As a result of the conduct of the PFAS Cover-Up

[77] The Standard was first adopted in 1983 in the United States with limited scope (Hazard Communication, 48 Fed. Reg. 53280 (Nov. 25, 1983)). In 1987, it was expanded to cover all industries where employees are potentially exposed to hazardous chemicals (Hazard Communication, 52 Fed. Reg. 31852 (Aug. 24, 1987)).

[78] *Hazard Communication Standard: Safety Data Sheet*, OSHA, *available at* https://www.osha.gov/sites/default/files/publications/OSHA3514.pdf.

Enterprise, Plaintiff and the Class Members overpaid for Turnout Gear and were deprived of the ability to buy PFAS-free Turnout Gear.

**COUNT II**
**Violation of the Alabama Commercial Law and Consumer Protection Law**
**Alabama Deceptive Trade Practices ACT ("ADTPA") Ala. Code § 8-19-5**

264. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

265. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

266. Alabama law prohibits "Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5(27).

267. Defendants developed, manufactured, marketed, and sold PFAS and PFAS Turnout Gear as alleged herein.

268. Defendants' PFAS Turnout Gear is defective because the addition of toxic PFAS renders the PFAS Turnout Gear inherently and unreasonably dangerous so that its mere presence causes serious health risk to firefighters and other exposed persons.

269. PFAS Turnout Gear is not reasonably safe and it fails to perform as safely as an ordinary user would expect and its risks far outweigh any utility.

270. All Defendants contributed to the defective and dangerous condition of the PFAS Turnout Gear.

271. Defendants violated Alabama law not only when they marketed and sold the PFAS Turnout Gear as safe for its intended and expected use, handling, cleaning, and storage, but also when they failed to disclose to Plaintiff and Class Members that the PFAS Turnout Gear posed a

serious health and safety risk to persons and property, despite Defendants' knowledge that PFAS Turnout Gear posed such a risk to Plaintiff and Class Members.

272. Defendants engaged in deceptive trade practices, in violation of Alabama law, by selling a product that was unsafe; implicitly and explicitly representing to Plaintiff and Class Members that PFAS Turnout Gear was safe to use; failing to warn Plaintiff and Class Members that PFAS Turnout Gear contained a defect that posed a serious safety risk to its users and others; deliberately sowing confusion and misunderstanding as to the dangerous characteristics of PFAS and PFAS Turnout Gear; and knowingly making false or misleading statements and withholding or omitting material facts concerning the safety of PFAS and PFAS Turnout Gear.

273. Defendants' acts and omissions were intended to be deceptive or fraudulent in order to market and sell PFAS and PFAS Turnout Gear and to avoid the costs associated with developing, manufacturing, and replacing PFAS and PFAS Turnout Gear with safer alternatives.

274. Plaintiff and Class Members suffered injury in-fact as a direct result of Defendants' violations of Alabama Law.

275. Plaintiff's property was contaminated with PFAS, causing plaintiff to incur costs for property damage remediation and replacement of the PFAS Turnout Gear.

276. Plaintiff and Class Members have been harmed by these violations of Alabama law. The damages should be trebled, and Plaintiff and Class Members should be permitted to recover attorneys' fees pursuant to Ala. Code § 8-19-10(2).

**COUNT III**
**Strict Product Liability (Design Defect)**

277. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

278. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

279. At all relevant times, Defendants were engaged in the business of selling PFAS molecules, PFAS Chemical Finishes, or PFAS Turnout Gear.

280. At all relevant times, Defendants manufactured and sold to Plaintiff and members of the Class unreasonably dangerous PFAS Turnout Gear.

281. Defendants' PFAS Turnout Gear is defective because the addition of toxic PFAS renders the PFAS Turnout Gear inherently and unreasonably dangerous such that its mere presence causes serious health risk to firefighters and other exposed persons.

282. PFAS Turnout Gear is unreasonably dangerous and fails to perform as safely as an ordinary user would expect, and its risks far outweigh any utility.

283. Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Plaintiff and Class Members, who might foreseeably be harmed by PFAS Turnout Gear.

284. PFAS Turnout Gear is unreasonably dangerous for its foreseeable uses and misuses because it contains highly toxic PFAS which migrate and contaminate the surrounding environment, property, firefighters, and other exposed persons, as set forth herein.

285. Firefighting activities involve exposure to extreme stressors that are known to result in increased concentrations of PFAS, as well as accelerated migration and contamination.

286. Defendants designed and manufactured PFAS Turnout Gear to include high concentrations of toxic PFAS in the structural components, as well as additional PFAS added through finishing sprays, adhesives, and reinforcements. The concentration of PFAS in Turnout Gear is far higher than in any other occupational gear.

287. Defendants added high concentrations of PFAS to PFAS Turnout Gear that they knew or should have known would have significant exposure to extreme stressors that volatize PFAS and accelerate their concentration and migration out of the PFAS Turnout Gear, causing unreasonably dangerous contamination of surrounding property and persons.

288. PFAS Turnout Gear was in a defective condition that made it unreasonably dangerous when it left Defendants' control.

289. All Defendants contributed to and are responsible for the defective condition of the PFAS Turnout Gear and had knowledge of its existence at the time it left their control.

290. As alleged herein, the PFAS in the PFAS Turnout Gear directly and proximately caused injuries to Plaintiff and Class Members' property. Plaintiff and Class Members suffered physical injuries as alleged more fully herein, including injury in the form of toxic contamination of their property.

**COUNT IV**
**Strict Product Liability (Failure to Warn)**

291. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

292. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

293. At all relevant times, Defendants were engaged in the business of selling PFAS molecules, PFAS Chemical Finishes, or PFAS Turnout Gear.

294. At all relevant times, Defendants manufactured and sold to Plaintiff and Class Members the unreasonably dangerous PFAS Turnout Gear.

295. Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products. Defendants' duty to warn extended to all third

parties who might foreseeably be harmed by the ordinary use and misuse of their products, including Plaintiff and Class Members.

296. Defendants had a duty to warn about the addition of PFAS to their PFAS Turnout Gear; the migration of PFAS out of PFAS Turnout Gear; PFAS contamination of the surrounding environment, property, and persons; and the known risks of PFAS exposure and unreasonable hazards to human health.

297. Defendants had superior knowledge of the toxicity and risks of PFAS generally and PFAS Turnout Gear, as well as the risks associated with its use by Plaintiff and Class Members.

298. Defendants' inadequate warnings and instructions rendered the PFAS Turnout Gear purchased by Plaintiff and Class Members defective and not reasonably safe.

299. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the existence of PFAS in their Turnout Gear, the dangers of PFAS, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

300. Defendants' PFAS Turnout Gear was defective by virtue of its inadequate warnings at the time it left Defendants' control; and the PFAS Turnout Gear reached Plaintiff, Class Members, and other end users without substantial change in their condition.

301. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Plaintiff and the Class Members, who would have heeded legally adequate warnings about the dangers of PFAS in PFAS Turnout Gear.

302. At all relevant times, Plaintiff and Class Members used their PFAS Turnout Gear as intended.

303. As alleged herein, the PFAS in the PFAS Turnout Gear directly and proximately caused injuries to Plaintiff and Class Members' property. Plaintiff and Class Members suffered physical injuries as alleged more fully herein, including injury in the form of toxic contamination of their property.

**COUNT V**
**Fraudulent Misrepresentation/Concealment**

304. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

305. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

306. Defendants represented that the PFAS Turnout Gear was safe and suitable for use by firefighters and concealed the fact that the PFAS Turnout Gear contained dangerous PFAS that could contaminate property.

307. Defendants knew or believed their statements to be false or that they were concealing material facts.

308. Defendants knew or should have known about the dangers of PFAS in their PFAS Turnout Gear and the unreasonably dangerous risks to human health caused by PFAS migration and contamination.

309. Defendants made these representations and concealed these facts to induce Plaintiff and Class Members to purchase the PFAS Turnout Gear.

310. Plaintiff acted in reliance on the truth of Defendants' statements or the assumption that no material facts were concealed.

311. Plaintiff purchased and used the PFAS Turnout Gear based on Defendants' representations about its safety and suitability and the absence of warnings about the existence of

PFAS in the PFAS Turnout Gear; migration of PFAS out of the PFAS Turnout Gear; PFAS contamination of the surrounding environment, property, and persons; and unreasonably dangerous risks to human health caused by PFAS contamination and exposure.

312. As a result of Plaintiff's and Class Members' reliance on Defendants' misrepresentations or concealment, Plaintiff's property was contaminated with PFAS, causing Plaintiff and Class Members to incur costs for property damage remediation and replacement of the contaminated Turnout Gear.

313. As alleged herein, the PFAS in the PFAS Turnout Gear directly and proximately caused injuries to Plaintiff and Class Members' property. Plaintiff and Class Members suffered physical injuries as alleged more fully herein, including injury in the form of toxic contamination of their property.

## COUNT VI
## Negligence

314. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

315. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

316. Defendants, as the manufacturers and suppliers of PFAS Turnout Gear, owed Plaintiff and Class Members a duty to provide safe equipment that would not cause property damage, contamination, or unreasonable risk to human health.

317. Defendants breached their duty by manufacturing and supplying PFAS Turnout Gear containing dangerous PFAS that migrated out of the PFAS Turnout Gear and contaminated the surrounding environment, property, and persons with highly toxic and carcinogenic PFAS, which present an unreasonable danger to human health and safety.

318. Defendants' breach was the proximate cause of Plaintiff Class Members' injuries.

319. Plaintiff and the Class Members have incurred costs for property damage remediation and replacement of the contaminated Turnout Gear.

320. As alleged herein, the PFAS in the PFAS Turnout Gear directly and proximately caused injuries to Plaintiff and Class Members' property. Plaintiff and Class Members suffered physical injuries as alleged more fully herein, including injury in the form of toxic contamination of their property.

**COUNT VII**
**Unjust Enrichment**

321. Plaintiff incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

322. Plaintiff brings this Count individually and on behalf of the Class against all Defendants.

323. Defendants' conduct alleged herein as resulted in their reaping benefits and wrongful receipt of profits.

324. Plaintiff and Class Members paid for PFAS Turnout Gear that they believed was safe and would not cause property contamination and unreasonably dangerous exposure to toxins that are harmful to human health.

325. Plaintiff and Class Members instead received highly toxic, unsafe, and unreasonably dangerous PFAS Turnout Gear that caused property damage and that will continue to cause such injuries until it is destroyed and disposed of properly.

326. Defendants' retention of profits from PFAS Turnout Gear violates the fundamental principles of justice, equity, and good conscience.

327. The benefits Defendants received were to Plaintiff and Class Members' detriment.

328. Accordingly, Defendants will be unjustly enriched unless they are ordered to disgorge those profits for the benefit of Plaintiff and the Class.

329. As a result of Defendants' wrongful conduct, Plaintiff and Class Members are entitled to an institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendants, and restitution from the same.

**COUNT VIII**
**Violation of Additional State Consumer Protection Laws**

330. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

331. Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices, including in violation of the state consumer-protection statutes listed below.

332. Defendants have engaged in "unfair methods of competition" and "unfair or deceptive acts or practices," in violation of the Alaska Unfair Trade Practices and Consumer Protection Act, ALASKA STAT. ANN. § 45.50.471, *et seq*.

a. The Alaska Unfair Trade Practices and Consumer Protection Act ("Alaska UTPA") broadly prohibits "unfair methods of competition" and "unfair or deceptive acts or practices," including "using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, omission, or suppression in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged." ALASKA STAT. ANN. §§ 45.50.471(a), 45.50.471(b)(12).

b. The Alaska Class Members are "consumers" within the meaning of ALASKA STAT. ANN. § 45.50.561(4).

c. Defendants were engaged "in the conduct of trade or commerce" within the meaning of ALASKA STAT. ANN. § 45.50.471(a) including when they advertised, sold and distributed their PFAS-products.

d. While in the "conduct of trade or commerce," Defendants employed deception and misrepresentation and knowingly concealed, suppressed, and omitted material facts regarding the safety of their products, as the Turnout Gear purchased and paid for by the Alaska Class Members was laden with PFAS; and Defendants acted with the "intent that others rely upon the concealment, omission, or suppression." ALASKA STAT. ANN. §§ 45.50.471(a), 45.50.471(b)(12).

e. In the course of purchasing, paying for, and providing the Turnout Gear, the Alaska Class Members were deceived by Defendants' misrepresentations and their failure to disclose that their Turnout Gear was laden with PFAS, and that the PFAS were unreasonably dangerous.

f. The Alaska Class Members reasonably relied on Defendants' misstatements and omissions, and they did not and could not reasonably unravel Defendants' deception on their own.

g. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

h. Defendants owed the Alaska Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable

risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Alaska Class Members.

i. The Alaska Class members suffered ascertainable losses of money or property as a result of Defendants' deceptive and unfair practices.

j. The Alaska Class Members suffered ascertainable loss, injury-in-fact, and actual harm as a proximate result of Defendants' actions.

k. Defendants' violations present a continuing risk to the Alaska Class Members. In addition, Defendants' unlawful acts and practices affect the public interest.

l. Alaska Class Members seek, *inter alia*, "to recover for each unlawful act or practice three times the actual damages or $500, whichever is greater." ALASKA STAT. ANN. § 45.50.531(a).

m. The Alaska Class Members further seek attorneys' fees, costs, and any other just and proper relief available under the Alaska UTPA. ALASKA STAT. ANN. §§ 45.50.531(a), 45.50.537.

333. Defendants have engaged in fraudulent, deceptive, and misleading conduct in connection with the sale and advertisement of consumer goods and services, in violation of the Arizona Consumer Fraud Act ("Arizona CFA"), ARIZ. REV. STAT. § 44-1521, *et seq*.

a. Under the Arizona CFA, "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).

b. Arizona Class Members are "person[s]" within the meaning of the Arizona CFA. ARIZ. REV. STAT. § 44-1521(6).

c. Defendants' PFAS and PFAS-laden products are "merchandise" within the meaning of the Arizona CFA. ARIZ. REV. STAT. § 44-1521(5).

d. In the conduct of trade or commerce, Defendants knowingly concealed, omitted, and suppressed material facts regarding the safety of PFAS and their PFAS-laden products with the intent that others rely upon the concealment, omission, or suppression.

e. In purchasing and paying for Turnout Gear, the Arizona Class Members were deceived by Defendants' misstatements and their failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

f. The Arizona Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

g. Defendants' concealment, omission, and suppression of material facts were likely to and did in fact deceive reasonable consumers.

h. Defendants owed the Arizona Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable

risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Class Members.

i. The Arizona Class Members suffered ascertainable loss, injury-in-fact, and actual harm as a proximate result of Defendants' actions.

j. Under the Arizona CFA, Arizona Class Members seek actual damages and punitive damages.

334. Defendants have engaged in unlawful, unfair, and fraudulent business acts or practices and unfair, deceptive, untrue, or misleading advertising that constitutes unfair competition in violation of the California Unfair Competition Law ("California UCL"), CAL. BUS. & PROF CODE § 17200, *et seq*.

a. The California UCL prohibits acts of "unfair competition," which Section 17200 defines as including any "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." CAL. BUS. & PROF CODE § 17200.

b. California Class Members are "person[s]" within the meaning of the Arizona CFA. CAL. BUS. & PROF CODE § 17201.

c. Defendants engaged in the following practices in violation of the California UCL in selling PFAS-laden products: (a) deceptively promoting the use of PFAS when they knew or should have known that PFAS pose serious risks of physical and environmental harm; (b) Misrepresenting the safety of PFAS and their PFAS-products, including PFAS Turnout Gear; (c) Concealing and suppressing material

facts regarding the safety of PFAS and their PFAS-products, including PFAS Turnout Gear.

335. Defendants have engaged in deceptive trade practices in violation of the Colorado Consumer Protection Act ("Colorado CPA"), COLO. REV. STAT. ANN. § 6-1-101, *et seq*.

a. The Colorado CPA prohibits deceptive trade practices, including the "fail[ure] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." COLO. REV. STAT. ANN. § 6-1-105(u).

b. Plaintiff, Colorado Class Members, and Defendants are "persons" within the meaning of under COLO. REV. STAT. ANN. § 6-1-102(6).

c. The Colorado Class Members are "consumers" for purposes of COLO. REV. STAT. ANN. § 6-1-113(1)(a).

d. Each Defendant's conduct, as set forth above, occurred in the conduct of trade or commerce.

e. In the course of purchasing, paying for, and providing the Turnout Gear, the Colorado Class Members were deceived by Defendants' misrepresentations and their failure to disclose that their Turnout Gear was laden with PFAS and that the PFAS were unreasonably dangerous.

f. The Colorado Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

g. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

h. Defendants owed the Colorado Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Colorado Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Colorado Class Members.

i. Defendants' conduct proximately caused harm to the Colorado Class Members.

j. Under the Colorado Consumer Protection Act, Plaintiff seeks monetary relief against each Defendant, including damages measured as (a) the "greater" of (I) "actual damages sustained," including prejudgment interest, (II) five hundred dollars, or (III) "[t]here times the amount of actual damages sustained," based on "clear and convincing evidence" of Defendants' "bad faith conduct." COLO. REV. STAT. ANN. § 6-1-113.

k. Plaintiff also seeks costs, attorneys' fees, and any other just and proper remedy under the Colorado CPA. COLO. REV. STAT. ANN. § 6-1-113(2)(b).

336. Defendants engaged in unfair, deceptive, and fraudulent business practices in violation of the Delaware Consumer Fraud Act, DEL. CODE TIT. 6, § 2513, *et seq*.

a. The Delaware Consumer Fraud Act prohibits unfair, deceptive, and fraudulent business practices, including by prohibiting "[t]he act, use, or employment by any

person of any deception, fraud, . . . misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such . . . , omission, in connection with the sale, lease, receipt, or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." DEL. CODE TIT. 6, § 2513(a).

b. Plaintiff, Delaware Class Members, and Defendants are "persons" within the meaning of DEL. CODE TIT. 6, § 2511(7).

c. Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

d. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted material facts regarding PFAS and that the Turnout Gear purchased by the Delaware Class Members were treated with PFAS-laden products; Defendants suppressed negative information about PFAS and PFAS-laden products; and Defendants misrepresented the safety of PFAS and their PFAS-laden products, with the intent that others rely upon the concealment, omission, or suppression.

e. In purchasing their Turnout Gear, the Delaware Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

f. The Delaware Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

g. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

h. Defendants owed the Delaware Class a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Delaware Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Delaware Class Members.

i. Defendants' conduct proximately caused harm to the Delaware Class Members.

j. The Delaware Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

k. Defendants' violations present a continuing risk to the Delaware Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest. Plaintiff seeks damages under the Delaware CFA for injury resulting from the direct and natural consequences of each Defendant's unlawful conduct. Plaintiff also seeks attorneys' fees and any other just and proper relief available under the Delaware CFA.

l. Defendants engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

337. Defendants engaged in deceptive commercial practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. ANN. 505/1, *et seq*.

a. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") declares several specific actions to be unlawful, including "any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

b. The Illinois Class Members are "consumers" within the meaning of 815 ILL. COMP. STAT. ANN. 505/1(e).

c. Defendants were engaged in "trade" and "commerce" within the meaning of 815 ILL. COMP. STAT. ANN. 505/1(f) when they sold their PFAS-laden products to Turnout Gear manufacturers.

d. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material facts regarding PFAS and that the Turnout Gear purchased by the Illinois Class Members were treated with PFAS-laden products; Defendants suppressed negative information about PFAS and PFAS-laden products; and Defendants misrepresented the safety of PFAS and their PFAS-laden products, with the intent that others rely upon the concealment, omission, or suppression.

e. In purchasing their Turnout Gear, the Illinois Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

f. The Illinois Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden

products, and they did not and could not reasonably unravel Defendants' deception on their own.

g. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

h. Defendants knew or should have known that their conduct violated the ICFA.

i. Defendants owed the Illinois Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Illinois Class Members.

j. Defendants' conduct proximately caused harm to the Illinois Class Members.

k. The Illinois Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

l. Defendants' violations present a continuing risk to the Illinois Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

m. Pursuant to 815 ILL. COMP. STAT. ANN. 505/10a(a), the Illinois Class Members seek monetary relief against Defendants measured as the greater of (a) actual damages

in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

n. The Illinois Class Members seek attorneys' fees and any other just and proper relief available under 815 ILL. COMP. STAT. ANN 505/10a(c).

338. Defendants have engaged in unfair and deceptive trade practices in violation of the Maryland Consumer Protection Act, MD. CODE ANN., COMM. LAW § 13-101, *et seq*.

a. The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive" and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," MD. CODE ANN., COMM. LAW § 13-301, regardless of whether the consumer is actually deceived or damaged, MD. CODE ANN., COMM. LAW § 13-302.

b. Defendants, Plaintiff, and Maryland Class Members are "persons" within the meaning of MD. CODE ANN., COMM. LAW § 13-101(h).

c. In purchasing their Turnout Gear, the Maryland Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

d. The Maryland Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

e. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

f. Defendants knew or should have known that their conduct violated the Maryland CPA.

g. Defendants owed the Maryland Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Class Members.

h. Defendants' conduct proximately caused harm to the Maryland Class Members.

i. The Maryland Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

j. Defendants' violations present a continuing risk to the Maryland Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

k. Pursuant to MD. CODE ANN., COMM. LAW § 13-408, Plaintiff seeks actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

339. Defendants have engaged in deceptive trade practices in violation of the Missouri Merchandising Practices Act, MO. REV. STAT. § 407.005, *et seq*.

a. The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020(1).

b. Defendants, Plaintiff, and Missouri Class Members are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

c. Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of MO. REV. STAT. § 407.010(7).

d. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material facts that Turnout Gear purchased by the Missouri Class Members were treated with PFAS-laden products, with the intent that others rely upon the concealment, omission, or suppression.

e. In purchasing their Turnout Gear, the Missouri Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

f. The Missouri Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

g. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

h. Defendants knew or should have known that their conduct violated the Missouri MPA.

i. Defendants owed the Missouri Class Members a duty to disclose the truth about PFAS and their PFAS-laden products.

j. Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Missouri Class Members.

k. Defendants' conduct proximately caused harm to the Missouri Class Members.

l. The Missouri Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

m. Defendants' violations present a continuing risk to the Missouri Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

n. The Missouri Class Members seek damages in amounts to be proven at trial, along with attorneys' fees, costs, and punitive damages, and any other just and proper relief under MO. REV. STAT. § 407.025.

340. Defendants engaged in unfair methods of competition and deceptive practices in the conduct of trade and commerce, in violation of the Montana Consumer Protection Act, MONT. CODE ANN. § 30-14-101, *et seq*.

a. The Montana Consumer Protection Act ("Montana CPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MONT. CODE ANN. § 30-14-103.

b. Defendants, Plaintiff, and the Montana Class members are "persons" within the meaning of MONT. CODE ANN. § 30-14-102 (6).

c. Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of MONT. CODE ANN. § 30-14-102 (8)(a).

d. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material facts that Turnout Gear purchased by the Montana Class members were treated with PFAS-laden products, with the intent that others rely upon the concealment, suppression, or omission.

e. In purchasing their Turnout Gear, the Montana Class members were deceived by Defendants' failure to disclose that their Turnout Gear was treated with PFAS-laden products.

f. The Montana Class members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

g. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

h. Defendants knew or should have known that their conduct violated the Montana CPA.

i. Defendants owed the Montana Class members a duty to disclose the truth about PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Montana Class Members.

j. Defendants' conduct proximately caused harm to the Montana Class members.

k. The Montana Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

l. Defendants' violations present a continuing risk to the Montana Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

m. The Montana Class members seek damages in amounts to be proven at trial, along with attorneys' fees, costs, and punitive damages, and any other just and proper relief under MONT. CODE ANN. § 30-14-102(8)(a).

341. Defendants have engaged in deceptive trade practices in violation of the Nevada Deceptive Trade Practices Act, NEV. REV. STAT. § 598.0903, *et seq*.

a. The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices. NEV. REV. STAT. § 598.0923(1)(b) provides that a "person engages in a 'deceptive trade practice" when in the course of his or her business or

occupation he or she knowingly … [f]ails to disclose a material fact in connection with the sale or lease of goods or services."

b. In purchasing their Turnout Gear, the Nevada Class Members were deceived by Defendants' failure to disclose the material fact that their Turnout Gear was treated with PFAS-laden products.

c. The Nevada Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

d. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

e. Defendants knew or should have known that their conduct violated the Nevada DTPA.

f. Defendants owed the Nevada Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Nevada Class Members.

g. Defendants' conduct proximately caused harm to the Nevada Class Members.

h. The Nevada Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

i. Defendants' violations present a continuing risk to the Nevada Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

j. The Nevada Class Members seek their actual damages, punitive damages, costs, attorneys' fees, and all other appropriate and available remedies under the Nevada DTPA. NEV. REV. STAT. § 41.600.

342. Defendants have engaged in unfair business practices, in violation of the New Hampshire Consumer Protection Act, N.H. REV. STAT. ANN. § 358-A:1, *et seq*.

a. The New Hampshire Consumer Protection Act ("New Hampshire CPA") makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. REV. STAT. ANN. § 358-A:2.

b. Defendants, Plaintiff, and New Hampshire Class Members are "persons" within the meaning of N.H. REV. STAT. ANN. § 358-A:1.

c. Defendants' actions as set forth herein occurred in the conduct of trade and commerce within the meaning of N.H. REV. STAT. ANN. § 358-A:1.

d. In purchasing their Turnout Gear, the New Hampshire Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

e. The New Hampshire Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

f. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

g. Defendants knew or should have known that their conduct violated the New Hampshire CPA.

h. Defendants owed New Hampshire Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS; that PFAS created an unreasonable risk of harm; and that the PFAS Turnout Gear posed serious environmental and health risks. purchased by the New Hampshire Class Members; and intentionally concealed the foregoing from the New Hampshire Class Members.

i. Defendants' conduct proximately caused harm to the New Hampshire Class Members.

j. The New Hampshire Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct, as a direct and natural consequence of Defendants' omissions.

k. Defendants' violations present a continuing risk to the New Hampshire Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

l. Because Defendants' willful conduct caused injury to Plaintiff's property through violations of the New Hampshire CPA, Plaintiff seeks recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; and any other just and proper relief under N.H. REV. STAT. ANN. § 358-A:10.

343. Defendants have engaged in deceptive trade practices in violation of the New Jersey Consumer Fraud Act, N.J. STAT. ANN. § 56:8-1, *et seq*.

a. The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. § 56:8-2.

b. Defendants, Plaintiff, and the New Jersey Class Members are "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d).

c. Defendants engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (d).

d. In purchasing their Turnout Gear, the New Jersey Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

e. The New Jersey Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden

products, and they did not and could not reasonably unravel Defendants' deception on their own.

f. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

g. Defendants knew or should have known that their conduct violated the New Jersey CFA.

h. Defendants owed the New Jersey Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the New Jersey Class Members.

i. Defendants' conduct proximately caused harm to the New Jersey Class Members.

j. The New Jersey Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

k. Defendants' violations present a continuing risk to the New Jersey Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

l. Plaintiff is entitled to recover treble damages, costs, and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

344. Defendants have engaged in deceptive trade practices in violation of the New Mexico Unfair Trade Practices Act, N.M. STAT. ANN. § 57-12-1, *et seq*.

a. The New Mexico Unfair Trade Practices Act ("New Mexico UTPA") makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12-2(D).

b. Defendants, Plaintiff, and the New Mexico Class Members are "person[s]" within the meaning of N.M. STAT. ANN. § 57-12-2.

c. Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined by N.M. STAT. ANN. § 57-12-2.

d. In purchasing their Turnout Gear, the New Mexico Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

e. The New Mexico Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

f. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

g. Defendants knew or should have known that their conduct violated the New Mexico UTPA.

h. Defendants owed the New Mexico Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the New Mexico Class Members.

i. Defendants' conduct proximately caused harm to the New Mexico Class Members.

j. The New Mexico Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

k. Defendants' violations present a continuing risk to the New Mexico Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

l. Because Defendants' unconscionable, willful conduct caused actual harm to Plaintiff, the New Mexico Class Members seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; reasonable attorneys' fees and costs; and all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

345. Defendants have engaged in unfair and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. § 75-1.1, *et seq*.

a. North Carolina's Unfair and Deceptive Acts and Practices Act ("North Carolina Act") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a).

b. Defendants engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

c. In purchasing their Turnout Gear, the North Carolina Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

d. The North Carolina Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

e. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

f. Defendants knew or should have known that their conduct violated the North Carolina Act.

g. Defendants owed the North Carolina Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to

extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the North Carolina Class Members.

h. Defendants' conduct proximately caused harm to the North Carolina Class Members.

i. The North Carolina Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

j. Defendants' violations present a continuing risk to the North Carolina Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

k. Plaintiff seeks an order for treble their actual damages, costs, attorneys' fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

346. Defendants have engaged in unlawful trade practices in violation of the Oklahoma Consumer Protection Act, OKLA. STAT. TIT. 15, § 751, *et seq*.

a. The Oklahoma Consumer Protection Act ("Oklahoma CPA") provides that a "person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act when, in the course of the person's business, the person . . . [c]ommits an unfair or deceptive trade practice as defined in Section 752 of this title." OKLA. STAT. TIT. 15, § 753(21). Section 752(13) provides that a "deceptive trade practice" means "a misrepresentation, omission or other practice that has

deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person."

b. Defendants, Plaintiff, and Oklahoma Class Members are "persons" within the meaning of OKLA. STAT. TIT. 15, § 752.

c. Each Defendant is a "person," "corporation," or "association" within the meaning of OKLA. STAT. TIT. 15, § 15-751(1).

d. In purchasing their Turnout Gear, the Oklahoma Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

e. The Oklahoma Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

f. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

g. Defendants knew or should have known that their conduct violated the Oklahoma CPA.

h. Defendants owed the Oklahoma Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks;

and Defendants intentionally concealed the foregoing from the Oklahoma Class Members.

i. Defendants' conduct proximately caused harm to the Oklahoma Class Members.

j. The Oklahoma Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

k. Defendants' violations present a continuing risk to the Oklahoma Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

l. Because Defendants' unconscionable conduct caused injury to Plaintiff, Plaintiff seeks recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15, § 761.1. Plaintiff further seeks any other just and proper relief available under the Oklahoma CPA.

347. Defendants have engaged in unlawful business practices in violation of the Oregon Unlawful Trade Practices Act, OR. REV. STAT. § 646.605, *et seq*.

a. The Oregon Unfair Trade Practices Act ("Oregon UTPA") provides that a "person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following: . . . (u) Engages in any other unfair or deceptive conduct in trade or commerce." OR. REV. STAT. § 646.608(1)(u).

b. Each Defendant and each Oregon Class member is a "person" within the meaning of OR. REV. STAT. § 646.605(4).

c. Their PFAS-laden products are "goods" within the meaning of OR. REV. STAT. § 646.605(6).

d. In purchasing their Turnout Gear, the Oregon Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

e. The Oregon Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

f. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

g. Defendants knew or should have known that their conduct violated the Oregon UTPA.

h. Defendants owed the Oregon Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Oregon Class Members.

i. Defendants' conduct proximately caused harm to the Oregon Class Members.

j. The Oregon Class Members suffered ascertainable loss, injury-in-fact, and actual harm as a proximate result of Defendants' actions.

k. Defendants' violations present a continuing risk to the Oregon Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

l. The Oregon Class Members are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1), (8). Plaintiff is also entitled to punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

m. The Oregon Class Members seek attorneys' fees and any other just and proper relief available under OR. REV. STAT. § 646.638(1), (8).

348. Defendants have engaged in unfair trade practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PA. CONS. STAT. § 201-1, *et seq*.

a. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including representing that goods or services have characteristics, benefits or qualities that they do not have; representing that goods or services are of a particular standard, quality or grade if they are of another; advertising goods or services with intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding. 73 PA. CONS. STAT. § 201-2(4).

b. Defendants, Plaintiff, and Pennsylvania Class Members are "persons" within the meaning of 73 PA. CONS. STAT. § 201-2(2).

c. All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 PA. CONS. STAT. § 201-2(3).

d. Defendants are liable to Plaintiff for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 PA. CONS. STAT. § 201-9.2(a).

349. Defendants have engaged in unfair trade practices in violation of the South Carolina Unfair Trade Practices Act, S.C. CODE ANN. § 39-5-10, *et seq*.

a. The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. CODE ANN. § 39-5-20(a).

b. Each Defendant is a "person" under S.C. CODE ANN. § 39-5-10.

c. Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiff seeks monetary relief to recover their economic losses. Because Defendants' actions were willful and knowing, Plaintiff's damages should be trebled.

d. Plaintiff further alleges that Defendants' malicious and deliberate conduct warrants an assessment of punitive damages because Defendants carried out despicable conduct with willful and conscious disregard of the rights of others. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

350. Defendants have engaged in deceptive trade practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Law, S.D. CODIFIED LAWS § 37-24-6, *et seq*.

a. The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") provides that it is a "deceptive act or practice for any person

to … (1) Knowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise or the solicitation of contributions for charitable purposes, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. CODIFIED LAWS §§ 37-24-6.

b. In purchasing their Turnout Gear, the South Dakota Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

c. The South Dakota Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

d. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

e. Defendants knew or should have known that their conduct violated the South Dakota CPL.

f. Defendants owed the South Dakota Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks;

and Defendants intentionally concealed the foregoing from the South Dakota Class Members.

g. Defendants' conduct proximately caused harm to the South Dakota Class Members.

h. The South Dakota Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

i. Defendants' violations present a continuing risk to the South Dakota Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

j. Under S.D. CODIFIED LAWS § 37-24-31, the South Dakota Class Members are entitled to a recovery of their actual damages suffered as a result of Defendants' acts and practices.

351. Defendants have engaged in deceptive trade practices in violation of the Texas Deceptive Trade Practices and Consumer Protection Act, TEX. BUS. & COMM. CODE § 17.4, *et seq*.

a. The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides that "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." TEX. BUS. & COMM. CODE § 17.46(a). The Texas DTPA further declares that "the term 'false, misleading, or deceptive acts or practices' includes, but is not limited to, the following acts: several specific actions to be unlawful, including: . . . (24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a

transaction into which the consumer would not have entered had the information been disclosed."

b. Their PFAS-laden products are "goods" within the meaning of TEX. BUS. & COMM. CODE § 17.45(1).

c. Defendants, Plaintiff, and the Texas Class Members are "persons" within the meaning of TEX. BUS. & COMM. CODE § 17.45(3).

d. Each Plaintiff and each Texas Class member is a "consumer" within the meaning of TEX. BUS. & COMM. CODE § 17.41(4).

e. Defendants committed the acts complained of herein in the course of "trade" and "commerce" within the meaning of TEX. BUS. & COMM. CODE § 17.41(6).

f. In purchasing their Turnout Gear, the Texas Class Members were deceived by Defendants' knowing failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

g. The Texas Class Members reasonably relied on Defendants' knowing omissions, and they did not and could not reasonably unravel Defendants' deception on their own.

h. Defendants' knowing concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

i. Defendants knew that their conduct violated the Texas DTPA.

j. Defendants owed the Texas Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members;

that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks; and Defendants intentionally concealed the foregoing from the Texas Class Members.

k. Defendants' conduct proximately caused harm to the Texas Class Members.

l. The Texas Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

m. Defendants' violations present a continuing risk to the Texas Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

n. As a direct and proximate result of Defendants' violations of the Texas DTPA, the Texas Class Members have suffered injury-in-fact and/or actual damages.

o. Plaintiff seeks monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages for Defendants' knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

p. Alternatively, or additionally, pursuant to TEX. BUS. & COMM. CODE § 17.50(b)(3) & (4), the Texas Class Members are also entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA or which the Court deems proper.

352. Defendants have engaged in unfair business practices in violation of the Washington Consumer Protection Act, WASH. REV. CODE ANN. § 19.86.010, *et seq*.

a. The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE ANN. § 19.96.010.

b. Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE ANN. § 19.96.010.

c. In purchasing their Turnout Gear, the Washington Class Members were deceived by Defendants' failure to disclose materials facts regarding the safety of PFAS and their PFAS-laden products.

d. The Washington Class Members reasonably relied on Defendants' omissions and misleading assurances regarding the safety of PFAS and their PFAS-laden products, and they did not and could not reasonably unravel Defendants' deception on their own.

e. Defendants concealed, omitted, and suppressed material facts regarding the safety of their PFAS-products, thereby deceiving reasonable consumers.

f. Defendants knew or should have known that their conduct violated the Washington CPA.

g. Defendants owed the Washington Class Members a duty to disclose the truth about PFAS and their PFAS-laden products because Defendants possessed superior knowledge that their products contained PFAS, that PFAS created an unreasonable risk of harm, that PFAS were applied to Turnout Gear purchased by the Class Members; that the PFAS Turnout Gear, which would foreseeably be exposed to extreme heat and off-gas toxic fumes, posed serious environmental and health risks;

and Defendants intentionally concealed the foregoing from the Washington Class Members.

h. Defendants' conduct proximately caused harm to the Washington Class Members.

i. The Washington Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

j. Defendants' violations present a continuing risk to the Washington Class Members. Defendants' unlawful acts and practices complained of herein affect the public interest.

k. Defendants are liable to Plaintiff for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under WASH. REV. CODE ANN. § 19.86.090.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of itself and the members of the Class, respectfully requests this Court render judgment in their favor against Defendants, jointly and severally, and grant Plaintiff and the Class the following equitable and monetary relief:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a) & (b) of the Federal Rules of Civil Procedure, that the Plaintiff be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and that the Court direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class Members;

B. Certification of the proposed Nationwide or Alabama Class;

C. Appointment of the undersigned counsel for the proposed Class;

D. Compensatory damages for property damage caused by the PFAS Turnout Gear in an amount to be determined at trial;

E. Damages for the costs to properly retrieve, remove, destroy, and dispose of PFAS Turnout Gear an amount to be determined at trial;

F. Damages against Defendants for the cost of replacing all PFAS Turnout Gear in an amount to be determined at trial;

G. Restitution of all amounts by which Defendants were unjustly enriched, including revenues received related to PFAS Turnout Gear, in an amount to be determined at trial;

H. Punitive damages against Defendants in an amount to be determined at trial;

I. Attorneys' fees and costs;

J. Pre-judgment and post-judgment interest as allowed by law; and

K. Any and all such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of itself and Class Members, demands a trial by jury as to all issues triable as of right.

Dated: July 23, 2026

*s/ Starr Culpepper*
Starr Culpepper (AL BAR# 5645R46J)
**CULPEPPER & ASSOCIATES, LLC**
P.O. Box 145
Lipscomb, AL 35006
Telephone: 205-529-9413
starr@culpepper.law

*s/ Shelby Yarbrough*
Shelby Yarbrough (AL BAR# 7792J20R)
**THE LAW OFFICES OF BARRETT & YARBROUGH, LLC**
P.O. Box 55811
Birmingham, AL 35255-8511
Telephone: (205) 470-3136
shelby@bylegalservices.com

***Counsel for Plaintiff and the Proposed Class***